2021 IL App (1st) 180701-U

No. 1-18-0701

FIFTH DIVISION
JUNE 18, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 18305 |
| | ) | |
| DOUGLAS LIVINGSTON, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The defendant's conviction is affirmed over his contention that his jury waiver was rendered invalid by the "surprise disclosure" of evidence during trial.

¶ 2    Following a bench trial, the defendant Douglas Livingston was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2012)), and sentenced to consecutive terms of 40 years and 6 years, respectively.

On appeal, the defendant contends that his jury waiver was rendered invalid by the "surprise disclosure" of evidence during trial. We affirm the judgment of the circuit court of Cook County.

¶ 3   Following a July 21, 2012 incident during which Roshone Eldridge was fatally shot and Sharon Greer suffered a gunshot wound, the defendant was charged with eight counts of first degree murder, two counts of attempted first degree murder, and one count of aggravated battery with a firearm.

¶ 4                                    BACKGROUND

¶ 5   On May 30, 2017, the trial court explained the difference between a jury trial and a bench trial to the defendant. In particular, the court told the defendant that he had the right to a jury trial in which 12 citizens from the community would listen to the evidence and the arguments, be instructed on the law by the court, and would have to unanimously agree whether the defendant was proven guilty of the charge. The defendant stated that he understood the court's explanation. The court asked the defendant whether he understood that by signing a written jury waiver, he was indicating that he wished to waive his right to a jury trial. The defendant stated that he understood that he was waiving his right to a "jury trial" and that he wanted a bench trial. The defendant confirmed that he was not promised anything, forced, or coerced into choosing a bench trial, and had made the decision freely and voluntarily. The court accepted the defendant's signed jury waiver, which is included in the record on appeal. The matter was tried before the court and the following evidence was adduced.

¶ 6   Sharon testified that in 2012, she lived in the 5700 block of South Sangamon Street in Chicago with family members including her adult sons Calvin and Kevin.[1] She was engaged to

---

[1] For clarity, we will refer to the members of the Greer family by their given names.

Eldridge, who lived one house away. Around 11:30 p.m. on July 20, 2012, Sharon, Eldridge, and Eldridge's mother returned home to discover two "little boys" shooting BB guns or throwing rocks at Eldridge's truck, which was parked in the vacant lot adjacent to his home. Eldridge asked the boys why they were "doing that" and who would pay if a window were broken. The children walked down the street. Next, a large group of people approached Sharon's and Eldridge's homes. The defendant was at the front of the group. Sharon testified that she had known the defendant since she was a teenager. At this time, Sharon and Eldridge were on Eldridge's porch. The porch light was on, as were the streetlights and the porch light at a neighbor's home. An argument ensued regarding whether Eldridge threatened the children. At one point, defendant said he would "lay [Eldridge] down for six months," which Sharon understood as a threat to shoot or kill Eldridge. Sharon tried to deescalate the situation and the group eventually left.

¶ 7    Later, as Eldridge and Sharon discussed getting food, she saw a shadow, turned her head, and saw the defendant holding a firearm which he began to fire. Nothing obstructed her view of the defendant. There was another individual across the street, but Sharon could not see that person's face. Eldridge fell to the ground. Sharon also fell to the ground and later passed out as an ambulance took Eldridge to the hospital. Sharon later realized that she had suffered a gunshot wound to the wrist. Eldridge died on July 24, 2012. Sharon spoke to police and identified the defendant as the shooter. She also identified the defendant in a photographic array and a lineup.

¶ 8    During cross-examination, Sharon testified that the crowd that had approached Eldridge's house was large, but only the defendant threatened Eldridge. She did not remember speaking to police officers at the scene of the shooting, but thought she told Chicago police detective Brian

Forberg that the defendant was the shooter. Sharon denied telling Chicago police officer Michael Callahan that two men came through the vacant lot; rather, she identified the defendant.

¶ 9 During redirect examination, Sharon testified that she was "destroyed" when she briefly spoke to Detective Forberg at the hospital on July 21, 2012. During questioning by the court. Sharon testified that Detective Forberg asked a lot of questions and she only "[v]aguely" remembered her answers.

¶ 10 Officer Callahan testified that he spoke to Sharon at the scene and that she stated two "male blacks" came through a vacant lot and shot Eldridge. During cross-examination, Officer Callahan testified that he only spoke to Sharon at the scene. During redirect, he described Sharon as "shooken up." Upon questioning by the court, he testified that he did not believe that Sharon said the offender was 30 to 40 years old.

¶ 11 On July 13, 2017, the second day of defendant's trial, the trial court indicated that the State had learned new information from Kevin to court and tendered that material to the defense. The defense requested a continuance so that it could investigate the allegations. The trial court asked whether it was correct that the information came to light that day, and the State answered yes. The trial court then stated:

> "It's not something that the State held in their back pocket negligently or purposefully. *** The parties advised me that this *** information *** came up today. I will give the State two options. If they wish to proffer testimony relating to this new information only learned today, I will give the Defense a continuance, *** or the State can proceed with its testimony today, but I will not permit the State to elicit testimony concerning that new information. How does the State wish to proceed?"

¶ 12    The State offered to bring Kevin back on the next court date so that the defense could investigate the information. Defense counsel agreed, and the trial court granted a continuance.

¶ 13    However, before adjourning for the continuance, Calvin testified. On the evening of July 21, 2012, Calvin was on the front porch with Kevin and others. Between 11 and 11:30 p.m., three or four kids around 12 years old were shooting BB guns at Eldridge's truck. When Eldridge returned home, he asked the kids to "take it down the street," and they ran off. Soon after, a group of people, including the defendant, approached and the situation went "left field." The group, with the defendant as the "main one," told Eldridge that "he was gone get his" and "they gone put him 6 feet under." As Sharon and Calvin tried to defuse the situation, Eldridge's mother came out and said she would call the police. The defendant then said, "who was riding with him going get theirs too," then "flashed" a firearm and walked away.

¶ 14    Around an hour later, Calvin was on the porch steps and heard gunshots from the side of Eldridge's house where the vacant lot was located. Calvin walked onto the sidewalk and saw the defendant run past him while firing a weapon. Sharon and Eldridge were both on the ground and Calvin thought they were dead. Sharon got up but Eldridge had wounds to his back.  When police officers arrived, Calvin spoke to two detectives, identified the defendant as the shooter, and described him as between 30 to 40 years old, with "light skin," bowlegged and skinny, and wearing a white t-shirt and shorts. The following day, Calvin identified defendant in a photographic array and in video surveillance footage from a nearby business. On August 30, 2012, Calvin identified defendant in a lineup.

¶ 15    During cross-examination, Calvin denied showing a firearm to the group that had confronted Eldridge. At the time of the shooting, Calvin could only see a shadow, but then saw the

shooter. When he met with a detective, Calvin identified the defendant as the shooter. He described the defendant as between 30 and 40 years old with a "low" haircut. During redirect examination, Calvin testified that he initially only saw a shadow, but the shooter continued to shoot while fleeing and that allowed him to see that it was the defendant. The case was then continued.

¶ 16 On August 4, 2017, Kevin, who acknowledged a 2014 conviction for possession of a controlled substance, testified consistently with Calvin that some teenagers shot BB guns at Eldridge's truck, Eldridge told them to stop, the kids left, and soon after a group of about 10 people approached and asked Eldridge why he had threatened the kids. The defendant was in the group. When Eldridge's mother threatened to call the police, the defendant lifted his shirt to reveal the handle of a firearm and said whoever was "riding" with Eldridge "could get it too." The group then left. Around 30 minutes later, there was "a lot" of shooting from the side of Eldridge's home. Initially, Kevin could not see the shooter, but as he continued to look, he recognized the defendant. Kevin explained that as the defendant ran, his face became visible. Kevin stayed on the porch after the shooting where he was later approached by Detective Forberg. The following day, Kevin identified the defendant in a photographic array and on a surveillance video from the store across the street. He later also identified the defendant in a lineup.

¶ 17 Kevin did not see the defendant again until November 20, 2014, when they were both in custody and met in the "bullpen" at the county jail. The defendant apologized for "what he did," said he did not "mean it to go like that," and told Kevin to tell Sharon not to come to court. The defendant also offered to pay Sharon. Kevin did not see the defendant again.

¶ 18 During cross-examination, Kevin testified that he was in the bullpen at the county jail because of a pending case against him. Kevin reiterated that while in the bullpen, the defendant

said he was "sorry," and it was not meant "to go like that." Kevin did not tell anyone what the defendant said until the prior court date. Kevin acknowledged testifying before the grand jury that the group threatened Eldridge but did not remember describing the defendant's hair style or stating that the defendant wore a hat.

¶ 19     During redirect examination, Kevin testified that he identified the defendant as the shooter during the initial conversation with a detective. When the defendant initially confronted Eldridge regarding threatening the kids, he was wearing a white t-shirt and khaki shorts, and although the shooter later wore the same outfit, Kevin testified that he identified the defendant by his face, not his clothes.

¶ 20     Detective Forberg testified that when he arrived at the scene, Eldridge and Sharon were no longer present. However, he spoke with Kevin and Calvin who identified the shooter as the defendant. They described the defendant as 30 to 40 years old with a medium complexion and a "low" haircut. Kevin also stated the defendant was bowlegged. Detective Forberg then went to the hospital to talk to Sharon, who had a gunshot wound and lacked the "right mental composure" to talk. He later obtained surveillance video from a nearby store which showed an individual wearing a white t-shirt and shorts with a "bowlegged gait," as well as the discharge of a firearm toward Eldridge's address. Detective Forberg further testified that the defendant was arrested in Minnesota on August 6, 2012, and thereafter brought back to Chicago.

¶ 21     The surveillance footage was played for the court. This footage is included in the record on appeal and shows flashes of light and a man wearing a light-colored hat and outfit running away.

¶ 22 During cross-examination, Detective Forberg did not recall either Kevin or Calvin stating that the defendant showed a firearm during the confrontation with Eldridge or that he wore a hat. He acknowledged that the firearm used in the shooting was not recovered from the defendant; rather, it was recovered in connection with the arrest of a man named Joseph Grant.

¶ 23 During redirect examination, Detective Forberg testified that Kevin and Calvin said the shooter wore a white t-shirt and shorts, and the person he observed in the surveillance footage wore the same outfit. During recross examination, Detective Forberg acknowledged that the person in the footage wore a white hat but did not recall anyone stating the defendant wore a hat.

¶ 24 Chicago Police Department evidence technician Juan Aguirre testified that he recovered four cartridge cases from the crime scene. The State entered stipulations that a firearms expert would testify that two firearms were used during the offense and that a medical examiner would testify that Eldridge sustained eight gunshots wounds which were the cause of his death.

¶ 25 In closing argument, defense counsel stated that five years after the shooting, new evidence was revealed including that the defendant "flashed" a firearm during the confrontation and confessed to Kevin. Counsel argued it was "completely incredible" that Kevin never told anyone about the defendant's confession and first mentioned it at trial. Counsel also noted the hat, the lack of lighting, and the speed of the incident, and concluded that the family decided "at some point" that the defendant was the shooter. The State responded that Kevin and Calvin had immediately identified the defendant to Detective Forberg, including his bowlegged gait, and that Sharon, despite being "hysterical" at the time, did the same. The State also argued that the video evidence corroborated the witnesses' testimony.

¶ 26    In finding the defendant guilty of the first degree murder of Eldridge and aggravated battery with a firearm against Sharon, the court rejected the defense theory that the family decided to name the defendant as the shooter. The court noted that Calvin and Kevin identified the defendant as the shooter while Sharon was elsewhere without knowing whether she would "back them up." The witnesses also gave a physical description. While the hat might have been "much more important" if the defendant were a stranger, the witnesses recognized *and* named the defendant. The court found the defendant not guilty of attempted murder.

¶ 27    On September 11, 2017, defense counsel filed a motion for a new trial. However, at the hearing on the motion, counsel stated that the defendant had retained new counsel and asked leave of court to withdraw. Posttrial defense counsel then entered his appearance, filed a motion for a new trial, and stated that the motion would be supplemented following review of the trial transcripts and discovery.

¶ 28    On January 18, 2018, posttrial defense counsel filed a motion for acquittal or new trial. Relevant to this appeal is the allegation that the defendant's jury waiver was invalid because it was made without the defendant's knowledge of all the evidence against him. The motion acknowledged that the State "apparently" learned of the defendant's statement to Kevin on July 13, 2017, but argued that if this information had been disclosed prior to trial, the defendant may not have chosen a bench trial.

¶ 29    On March 2, 2018, the trial court heard argument on the motion. That State reiterated that it learned of the defendant's statement to Kevin for the first time on July 13, 2017, and that the court and trial counsel were immediately informed. Posttrial counsel responded that the defendant was entitled to know the evidence against him prior to making a jury waiver, and that in this case,

the defendant had no idea an "incriminating statement" would be admitted. Counsel argued that the case went from an "identification case" to an "identification case with a statement." Counsel concluded that the defendant's jury waiver was invalid because it was made without knowledge of the evidence the defendant would be facing at trial.

¶ 30 In denying the defendant a new trial, the court stated it believed the State's representation that it learned of the statement on July 13, 2017, and that this representation was corroborated by Kevin's testimony that he never told anyone about the statement until July 13, 2017. The court noted that Kevin was cross-examined on his failure to tell anyone about the statement. The court also noted that when rendering its guilty finding, there was "no reference whatsoever" to the "purported statement"; rather the analysis "centered" on the efficacy and manner of the identifications by the State's witnesses. After hearing evidence in aggravation and mitigation, the trial court sentenced the defendant to 40 years in prison for first degree murder and to a consecutive 6-year term for aggravated battery with a firearm. The defendant did not file a postsentencing motion but did file a timely notice of appeal. Accordingly, this court has jurisdiction.

¶ 31 ANALYSIS

¶ 32 On appeal, the defendant contends that his jury waiver was "negated" by the "surprise disclosure" during trial that Kevin would testify that the defendant made an inculpatory statement. He argues that the disclosure of this evidence could have affected his decision to waive a jury trial. He acknowledges that this issue was not preserved for appeal due to his failure to make a contemporaneous objection at trial but asks this court to review his claim pursuant to the plain error doctrine. The State responds that the defendant cannot establish plain error because no error occurred in this case.

¶ 33   Generally, to preserve an error for appellate review, a defendant must make both a contemporaneous objection at trial and raise the issue in a posttrial motion. See, *e.g.*, *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The plain error doctrine permits this court to consider an unpreserved error when an error occurred and (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). An error that deprives the defendant of his right to a jury trial is reviewable under the second prong of the plain error doctrine because it is a fundamental right. *People v. Bracey*, 213 Ill. 2d 265, 270 (2004). Our first inquiry, however, is whether an error occurred. See *People v. Hood*, 2016 IL 118581, ¶ 18 (without error, there can be no plain error).

¶ 34   The right to a jury trial includes a defendant's right to waive a jury trial. *People v. Bannister*, 232 Ill. 2d 52, 65 (2008). To be valid, a jury waiver must be knowingly and understandingly made. *Bracey*, 213 Ill. 2d at 269-70. Whether a jury waiver is valid depends on the facts and circumstances of each case and does not rest on any "precise formula." *People v. Clay*, 363 Ill. App. 3d 780, 791 (2006). The key concept that the defendant must understand is that the judge, not a jury, will be deciding his case. *Bannister*, 232 Ill. 2d at 69. "Although a signed jury waiver alone does not prove a defendant's understanding, it is evidence that a waiver was knowingly made." *People v. Reed*, 2016 IL App (1st) 140498, ¶ 7. It is the defendant's burden to establish that his jury waiver was invalid. *Id*. Where, as here, the facts relating to the jury waiver are not disputed, we review *de novo* whether the defendant knowingly and understandingly waived his right to a jury trial. *Bracey*, 213 Ill. 2d at 270.

¶ 35    Initially, we note that the defendant does not challenge the validity of his May 30, 2017 jury waiver at its inception; rather, he argues that its validity was negated on July 13, 2017, when Kevin disclosed for the first time that the defendant had made an inculpatory statement. The defendant argues that Kevin's testimony changed the "nature" of the case such that his jury trial waiver was not knowingly and understandingly made. He relies on *People v. Aguilar*, 218 Ill. App. 3d 1 (1991), and *People v. Blackman*, 359 Ill. App. 3d 1013 (2005), for the proposition that a jury waiver may be invalid when a defendant is denied critical information about his case.

¶ 36    In *Aguilar*, during the defendant's bench trial, the arresting officer revealed during cross-examination, that an informant had been paid cash for help arranging certain drug transactions. *Aguilar*, 218 Ill. App. 3d at 4, 9. The defendant, relying on his pretrial discovery request that the State disclose any consideration paid to a witness in exchange for, or in relation to, testimony, moved to dismiss the indictment. *Id.* at 9. The trial court denied the motion but granted a six-week continuance. The defendant was thereafter found guilty of delivery of a controlled substance.

¶ 37    On appeal, the appellate court found that the State had ignored the defendant's discovery request by not disclosing that the State's informant was paid. *Id.* at 9-10. Although the appellate court recognized that the continuance permitted the defendant to "obtain the same mileage" from the previously undisclosed evidence, it still reversed and remanded the case because the defendant was "denied the full opportunity to prepare his defense and make tactical decisions with the aid of [the] information." *Id.* at 10. In particular, the defendant suffered "extreme prejudice" because if he had received the information in a timely way, he may have elected a jury trial over a bench trial. *Id.* The appellate court also considered whether the six-week continuance was an appropriate

discovery sanction and concluded that the "appropriate remedy" was a new trial. The appellate court remanded the case for a new trial. *Id.* at 10-11.

¶ 38     In *Blackman*, this court relied on *Aguilar* to find that the trial court's offer of a continuance was insufficient to remedy the prejudice suffered by the defendant when the State failed to disclose that one of its key eyewitnesses had been paid $20,000 in relocation expenses. *Blackman*, 359 Ill. App. 3d at 1021. We noted that the defendant could not have made "an informed and intelligent waiver of his right to a jury trial because the State violated the discovery rules" by not disclosing a material fact. *Id.* at 1019, 1021.

¶ 39     In this case, we are unpersuaded by the defendant's reliance on *Aguilar* and *Blackman* because those cases dealt with the *State's* failure to disclose evidence. Pursuant to Supreme Court Rule 415(b) (eff. Oct. 1, 1971), a party has a continuing duty to disclose any additional material or information which is discovered after initial compliance with discovery and "if additional material or information is discovered during trial, the court shall also be notified." In this case, the State complied with the rule. When Kevin disclosed his 2014 conversation with the defendant, the State immediately informed the trial court and defense counsel. Although the defendant concedes that the State did not fail to disclose the evidence at issue, he argues that the principle is the "same" regardless of the cause of the late disclosure. However, he cites no support for applying that principle when a witness, rather than the State, fails to disclose evidence.

¶ 40     Thus, the defendant cannot establish that the State failed to disclose the evidence at issue in this case. See *Brady v. Maryland*, 373 U.S. 83 (1963). On the contrary, the record reveals that the State immediately disclosed the evidence once it was revealed and thus complied with Rule

415(b). Absent error, the defendant cannot establish plain error (*Hood*, 2016 IL 118581, ¶ 18), and his argument fails.

¶ 41    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 42    Affirmed.