THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARL WILLIAMS, Defendant-Appellant.

First District (1st Division)   No. 1—97—0669

Opinion filed June 1, 1999.

Rita A. Fry, Public Defender, of Chicago (Pamela Pfrang, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Mary P. Needham, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GALLAGHER delivered the opinion of the court:

Following a jury trial, defendant Carl Williams was convicted and sentenced on two counts of first degree murder, and on charges of aggravated criminal sexual assault, armed robbery, and vehicular hijacking. On appeal, defendant argues that the trial court erred in denying his pretrial motions to quash his warrantless arrest and suppress evidence and to suppress statements and that he was denied effective assistance of counsel. We affirm.

In the early morning hours of January 13, 1994, Reginald Wilson, Steven Fitch, and Felicia Lewis were driving in Wilson's black Chevy Blazer and they stopped at a gas station at 79th and State Streets so that Wilson and Fitch could use the restroom facilities. Fitch went to the restroom while Wilson remained outside the Blazer chatting with Lewis. When Fitch returned from the restroom, he saw two men he did not know at the Blazer. As Fitch approached, one of the men confronted him and said, "What the fuck you looking at?" Fitch turned away from the car and tried to enter the gas station but could not get in because the door was locked. When the Blazer drove out of the gas station with one of the men driving and the other in the back with

Wilson and Lewis, Fitch ran across the street and called the police to report the hijacking. Police officers picked up Fitch and drove around the area with him, hoping to locate the Blazer, but they were unsuccessful.

At approximately 8:30 a.m. that same morning, a Sauk Village police officer pulled up behind a black Chevy Blazer that had been idling suspiciously on a residential street. When the uniformed officer exited his car and approached the Blazer, it sped off. The officer pursued the Blazer, which subsequently ran up onto the lawn of a home. Sauk Village police apprehended the two men who ran from the car. They were identified as Scott Chambers and Stanley Hamelin. From the papers littering the car, Sauk Village police determined that Wilson was the car's registered owner. They contacted Wilson's family, who informed them of the hijacking.

Later that day, the frozen bodies of Wilson and Lewis were discovered in a garbage Dumpster in the 4800 block of South Vincennes, in Chicago. They had died of multiple gunshot wounds. Several 9 millimeter cartridge cases were found in the Dumpster and on the bodies. When Chicago police removed the bodies from the Dumpster, they found Felicia's state identification card and contacted her family, who informed them of the hijacking and that the Blazer had been found in Sauk Village.

The Area One detectives working on the murders went to Sauk Village to discuss the case and examine the car. Chambers and Hamelin were then transported to Area One headquarters. At Area One, Fitch viewed a lineup consisting of Chambers, Hamelin and five "fillers." Fitch positively identified Hamelin as the man who had spoken to him outside the Blazer at the gas station.

During separate police interviews, Chambers and Hamelin gave statements admitting their involvement in the hijacking. They provided the police with specific details about the hijacking and identified the three other men involved: "Bay," "Carl," and Anthony Brown. Chambers and Hamelin did not know the surname for "Carl" but provided police with a physical description and where he "hung around." Hamelin took detectives to the site where Lewis had been raped prior to her murder and then to the site of the murders, where he identified the Dumpster in which the bodies had been left.

Hamelin then took detectives to the area where Bay and Brown lived. The detectives went to Brown's residence but he was not home. As the detectives were pulling away from Brown's home, Hamelin identified a grey Chevy Caprice driving down the street as belonging to Brown. Hamelin identified Brown as the driver and Bay as the front seat passenger. There were also three people in the backseat.

Detectives stopped the car and brought the five occupants to Area One. Police recovered Fitch's portable compact disc player and Wilson's car stereo, compact discs, tapes and adaptor from the Caprice. At the station, Bay was identified as Zarice Johnson. The three passengers identified themselves as Rufus Seaton, Randy Johnson, and Larry McGee. The police did not consider Seaton, Johnson, and McGee to be suspects in the murders. During his questioning by police, McGee stated that he was not involved in the hijacking but that he knew who "Carl" was and where to find him. McGee did not know whether Carl was involved in the hijacking.

At 8:30 a.m. on January 14, 1994, McGee took detectives to the Ida B. Wells housing complex to show them where "Carl" "hung out." When detectives knocked on the door of the unit that McGee indicated, the door was answered by a woman and a little girl. The detectives identified themselves and the woman let the detectives into the residence. The detectives said that they were looking for "Carl." Detectives did not yet have a last name for Carl. Although the woman stated that no one named Carl lived in the residence, the child said "Carl's upstairs." An older man came to the stairs at this point and when Detective Turner asked about "Carl," the man pointed up the stairs. The detectives went upstairs and found a man matching "Carl's" physical description sitting on a bed in the room at the top of the stairs. When asked his name, he identified himself to the detectives as Carl Williams. Defendant was taken to Area One headquarters. The residence where defendant was arrested was the home of his girlfriend where he often stayed overnight. The woman who answered the door and allowed the officers to enter was his girlfriend's mother.

At Area One, detectives placed defendant in an interview room at approximately 10:30 a.m. on January 14 and advised him of his *Miranda* rights. During brief questioning by Detective Turner, defendant denied any knowledge of the hijacking or the murders and refused to speak with Detective Turner. Chambers and Hamelin identified a Polaroid photograph of defendant as their accomplice "Carl." At 5 p.m. defendant was moved from the interview room to the mission room, where he met with Assistant State's Attorney Grapsas. Assistant State's Attorney Grapsas explained that he was a prosecutor working with the police to investigate the murders and again advised defendant of his *Miranda* rights. Defendant agreed to speak with Assistant State's Attorney Grapsas and gave a statement about the murders. Detective Turner was present for defendant's statement. After a one-hour conversation with defendant, Assistant State's Attorney Grapsas and Detective Turner left the mission room while defendant considered whether he wanted his statement to be handwritten or taken by a

court reporter. Shortly thereafter, Assistant State's Attorney Grapsas returned to the mission room alone and asked defendant privately how he had been treated by police. Defendant told Assistant State's Attorney Grapsas that he had been treated fine by both the police and Assistant State's Attorney Grapsas. Although the mission room was subject to interruptions from other police officers entering and exiting, when Assistant State's Attorney Grapsas asked defendant about his treatment by police, they were alone.

At approximately 9 p.m., Assistant State's Attorney Grapsas and Detective Turner returned to the mission room and defendant told them that he wanted to give a handwritten statement. Assistant State's Attorney Grapsas had defendant read aloud each of the preprinted *Miranda* rights on the statement form. Defendant then signed the form to show that he understood his rights and wanted to make a statement. Seated opposite defendant at the desk in the mission room, Assistant State's Attorney Grapsas wrote out defendant's statement. Assistant State's Attorney Grapsas asked defendant to read out the first line of the handwritten statement to make sure that he could read Assistant State's Attorney Grapsas's handwriting. Defendant read it with no problem. While Assistant State's Attorney Grapsas wrote out the statement, defendant answered questions, clarified points and made corrections. Defendant identified photographs of Chambers, Hamelin, Johnson, and Brown and referred to them in his statement. Defendant and Assistant State's Attorney Grapsas reviewed the entire document together when it was completed. Defendant, Detective Turner, and Assistant State's Attorney Grapsas each initialed any changes made to the statement and then signed each page of the 10-page statement. Defendant added some additional information at the end of the statement and signed off on that as well. Assistant State's Attorney Grapsas had discussed the codefendants' statements regarding defendant's involvement in the murders with defendant once defendant had agreed to speak with him.

Defendant's statement related that late on January 12, 1994, defendant had been riding around town with codefendants Chambers, Hamelin, Brown, and Johnson in Brown's Chevy Caprice. Chambers had a 9 millimeter handgun with him which he had shown to everyone in the car. The fivesome had agreed to hijack a car, strip it, sell the parts, and split the proceeds. When they saw the Blazer at the gas station, they decided to hijack it. Defendant acted as lookout while Chambers and Hamelin approached the Blazer. At the Blazer, Chambers pointed the gun at Wilson and forced him back into the Blazer. After Fitch had run off, Hamelin got behind the wheel of the Blazer and Chambers got in the back of the Blazer with Wilson and

Lewis. The Blazer then followed the Caprice onto the Dan Ryan Expressway.

The two cars were driven to a parking lot at 47th Street. Defendant and Johnson got out of the Caprice and Hamelin got out of the Blazer. Defendant took Lewis from the Blazer and brought her to the Caprice. In the back seat of the Caprice, Brown raped Lewis after having forced her to perform oral sex on him. Defendant watched the rape and, after Brown had finished with her, asked Lewis for the key to the Blazer's wheel locks. Brown demanded money from Lewis and then returned her to the Blazer. Defendant, Brown and Johnson then left in the Caprice and drove around to look for police. Chambers and Hamelin remained with Wilson and Lewis in the Blazer. After driving around for 45 minutes, defendant, Brown and Johnson joined Chambers and Hamelin at Hamelin's sister's apartment, where Chambers told the group that he had shot the victims. Defendant received $30 as his share of the hijacking proceeds.

Prior to trial, defendant moved to quash his arrest and suppress evidence and to suppress his statements. After an evidentiary hearing, the trial court denied both motions. The court found that there was probable cause to arrest; that the defense had not sustained its burden to show that entry into defendant's girlfriend's home was not consensual; that even if entry was not consensual, there were exigent circumstances for entry; and that defendant had failed to show that his statements were involuntary. After a jury trial, the court sentenced defendant to natural life in prison for the first degree murder convictions and to concurrent 30-year sentences for aggravated criminal sexual assault, aggravated hijacking, and armed robbery. The court denied defendant's motion for a new trial and to reconsider the sentence.

■ On appeal, defendant argues that the trial court erred in denying his motion to quash his warrantless arrest and suppress evidence because the police lacked probable cause for making the warrantless arrest. If a trial court finds that a warrantless arrest was based on probable cause, the arrest is deemed lawful. *People v. Tisler*, 103 Ill. 2d 226, 237, 469 N.E.2d 147, 153 (1984). Under the probable cause standard, although evidence sufficient to sustain a conviction is not required, more than mere suspicion is necessary. *People v. Kidd*, 175 Ill. 2d 1, 22, 675 N.E.2d 910, 921 (1996). The ultimate burden of proving lack of probable cause remains with the defendant throughout the hearing. *People v. Ross*, 60 Ill. App. 3d 857, 861, 377 N.E.2d 230, 235 (1978). A trial court's ruling on a motion to suppress will not be reversed on appeal unless it is manifestly erroneous. *People v. Kidd*, 175 Ill. 2d at 22, 675 N.E.2d at 921.

Whether probable cause exists is a commonsense, practical question to be determined upon examination of the totality of the circumstances. *People v. Turner*, 240 Ill. App. 3d 340, 356, 608 N.E.2d 141, 152-53 (1992). If the totality of the circumstances known to the police at the time of arrest is sufficient to warrant a reasonably prudent person to believe that the suspect has committed a crime, then probable cause to arrest exists. *People v. Patterson*, 282 Ill. App. 3d 219, 227, 667 N.E.2d 1360, 1366 (1996). When one considers the totality of the circumstances present here at the time of defendant's arrest, it is manifestly clear that probable cause to arrest existed.

■ The police knew that a car had been hijacked; that the two occupants had been murdered; that the two men later found in the hijacked vehicle admitted their involvement in the hijacking; that these statements had been corroborated by the physical evidence found at the scene, by eyewitness testimony, and by Fitch's identification of Hamelin; that these men had identified three accomplices; that the identifications had already led to two arrests; that the third suspect was still at large; that the missing suspect was named "Carl," what his physical description was, and that he "hung around" a particular area; and that McGee, an associate of the codefendants, knew a "Carl" who matched the parameters of the information that the police had been given. Based on the totality of the circumstances known to police officers at the time of arrest, a reasonably prudent person could believe that the defendant had committed a crime. The trial court properly concluded that there was probable cause to arrest defendant.

■ Defendant argues that the court incorrectly assessed the reliability of the information that led the police to defendant. Defendant asserts that, because the information came solely from in-custody defendants and an unproven police informant, it required corroboration linking defendant to the offense for probable cause to exist. Probable cause for a warrantless arrest can be based upon information from an informant, but only if the informant's reliability has been previously established or the information independently corroborated. *People v. Sturdivant*, 99 Ill. App. 3d 370, 372-73, 425 N.E.2d 1046, 1048 (1981). However, if the informant "is a private citizen, not from the criminal milieu, prior reliability or independent corroboration may be unnecessary." *People v. Sturdivant*, 99 Ill. App. 3d at 373, 425 N.E.2d at 1048. The reliability of an ordinary citizen need not be established as in the case of a paid informant. *People v. Fisher*, 76 Ill. App. 3d 331, 334, 495 N.E.2d 54, 56 (1979). Absent indications to the contrary, one is presumed to be an ordinary citizen whose information is inherently reliable. *People v. Fisher*, 76 Ill. App. 3d at 334, 395 N.E.2d at 56. The Supreme Court adopted "the totality-of-the-

circumstances approach in the determination of probable cause, noting that this approach permits a balanced assessment of the relative weights of all the various indicia of reliability attendant upon the giving of the probable cause information." *People v. James*, 118 Ill. 2d 214, 223, 514 N.E.2d 998, 1002 (1987), citing *Illinois v. Gates*, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983). One indicia of the reliability of information exists when the facts learned through police investigation independently verify a substantial part of the informant's tip. *People v. James*, 118 Ill. 2d at 225, 514 N.E.2d at 1002-03. Another indicia of the reliability of information is found when the informant's statement constitutes an admission against the informant's penal interests. *People v. James*, 118 Ill. 2d at 225, 514 N.E.2d at 1002; *People v. Carpenter*, 95 Ill. App. 3d 722, 725, 420 N.E.2d 640, 642 (1981). When examining a ruling on a motion to quash, the reviewing court may consider any evidence adduced during trial which assists in establishing the legality of the arrest. *People v. Mitchell*, 123 Ill. App. 3d 868, 873, 463 N.E.2d 864, 869 (1984).

■ We find that Chambers', Hamelin's, and McGee's information was sufficiently reliable to constitute probable cause. Both Chambers and Hamelin made statements against their own interest, admitting their involvement in the hijacking and murders. In addition, the facts learned by the police during their investigation of the crimes (date, time, and location of the rape and murders; evidence collected from the vehicles, the Dumpster and the bodies; eyewitness testimony; lineup identification of Hamelin; and arrest of accomplices Johnson and Brown) provided independent verification of a substantial part of Chambers' and Hamelin's statements, leading to an inference of reliability for the information identifying "Carl" as an accomplice. We also note that the record does not reveal any specific inducements to Chambers and Hamelin to reveal their accomplices. Given the detectives' independent investigation and corroboration of Chambers' and Hamelin's self-incriminating statements, police had probable cause to arrest "Carl." The police found "Carl" by asking McGee.

Defendant argues that because McGee was in the car with codefendants Brown and Johnson, he is from the criminal milieu and therefore his information is unreliable. Conversely, defendant also uses this argument to state that police had no probable cause to arrest defendant just because he associated with Chambers and Hamelin. Associating with criminals does not provide probable cause for arrest nor does it mean one is part of the criminal milieu. Guilt by association is a thoroughly discredited doctrine. *People v. Ramirez*, 93 Ill. App. 2d 404, 410-11, 236 N.E.2d 284, 288 (1968).

There is nothing in the record to indicate that McGee was a

suspect in the instant offense or from the criminal milieu. Even if he was, this would not be determinative of McGee's unreliability but merely one factor to be considered within the totality of circumstances. *People v. Mitchell*, 123 Ill. App. 3d at 875, 463 N.E.2d at 870. McGee was a passenger in a car with two of the codefendants. He maintained that he knew nothing about the murders. He had not been implicated by either Chambers or Hamelin. The police did not consider him a suspect. McGee was a private citizen who, when asked by police, acknowledged that he knew who "Carl" was and where he stayed with his girlfriend. McGee did not implicate defendant; Chambers and Hamelin did. McGee's information did not require corroboration.

Some months after the court denied defendant's motions to suppress, the defendant learned that the man who had identified himself as "Larry McGee" was not actually Larry McGee. At the time of the murders, the real Larry McGee was serving a prison sentence and could not possibly have been at Area One headquarters talking to police. The man who helped police locate defendant was an unknown person using Larry McGee's name. The detectives had not run "McGee's" fingerprints as he was not a suspect in the case. They had no reason to believe that he was not who he said he was.

■ As defendant correctly states, a tip to police from an unknown person is insufficient to constitute probable cause to arrest because it merely establishes a suspicion. *People v. Almodovar*, 235 Ill. App. 3d 144, 151, 601 N.E.2d 853, 857 (1992), citing *People v. Hollins*, 169 Ill. App. 3d 304, 523 N.E.2d 1309 (1988). Information received from an unidentified informer, standing alone, does not qualify as information sufficiently reliable under the citizen-informer rule to support a finding of probable cause to arrest. *People v. Martin*, 46 Ill. App. 3d 943, 953, 361 N.E.2d 595, 602 (1977). We note, however, that "McGee" was not the informant who linked defendant with the crime. Chambers and Hamelin provided that information. "McGee" was a private citizen, albeit nameless, who led police to defendant. Rather than going door-to-door in the area where "Carl" was known to "hang out," in the hope that someone could identify him, the detectives took a direct approach in locating their suspect by asking "McGee," a known acquaintance of the codefendants, about someone with whom he might be familiar. He was. We conclude that the trial court correctly determined that probable cause to arrest existed.

■ Defendant next argues that the trial court erred in denying his motion to quash because the police lacked a warrant for making the in-home arrest. Defendant states that the court misapprehended the nature and scope of the consent given to police and the nature of exigent circumstances. Absent exigent circumstances, police should

seek a warrant when they plan to arrest a suspect in a residence. *People v. White*, 117 Ill. 2d 194, 210-11, 512 N.E.2d 677, 682 (1987). However, voluntary consent to enter a private residence will justify a warrantless at-home arrest even in the absence of exigent circumstances. *People v. White*, 117 Ill. 2d at 220-21, 512 N.E.2d at 687. Whether consent to enter was voluntary is a question for the trial court to be determined from the totality of the circumstances, and the court's decision will not be set aside unless it is clearly erroneous. *People v. Turner*, 240 Ill. App. 3d at 355, 608 N.E.2d at 151.

■ At the hearing on defendant's motion to suppress, defendant presented no evidence to rebut the detectives' assertion that the woman who opened the door voluntarily let the detectives into the home. The woman did not testify. Defendant testified that he only knew that the police were in the house when they appeared in the bedroom. He was not able to testify regarding how the officers entered the home because he was upstairs. Defendant asserts that the detectives were allowed into the home for the limited purpose of keeping out the cold but presented no evidence to sustain this argument. The trial judge could properly find that defendant had not sustained his burden to show that entry was not consensual.

■ ■ Even if there had been no voluntary consent to enter, the trial court could properly find that exigent circumstances existed to justify the warrantless arrest. Factors to be taken into account in determining whether exigent circumstances exist are:

> "(1) whether the offense under investigation has been recently committed [citation]; (2) whether there was any deliberate or unjustified delay by the officers during which time a warrant could have been obtained [citation]; (3) whether a grave offense is involved, particularly a crime of violence [citation]; (4) whether the suspect is reasonably believed to be armed [citations]; (5) whether the police officers were acting upon a clear showing of probable cause [citations]; (6) whether there is a likelihood that the suspect will escape if not swiftly apprehended [citation]; (7) whether there is strong reason to believe that the suspect is in the premises [citation]; and (8) whether the police entry, though nonconsensual, is made peaceably [citation]." *People v. White*, 117 Ill. 2d at 216-17, 512 N.E.2d at 685.

In the instant case, two murders, a robbery, hijacking and sexual assault had been committed the previous morning. Around-the-clock police work led detectives to defendant. There was no evidence of any unnecessary delay during which a warrant could have been obtained. The police had probable cause to arrest defendant based upon the information from Chambers, Hamelin, and McGee. Chambers had stated

that defendant was the shooter; therefore, defendant might be armed. With four of his accomplices already in custody, there was a good probability that defendant would be preparing his escape to avoid arrest. Police could strongly believe that defendant was at his girlfriend's home because he was known to spend the night there and detectives went to arrest him early in the morning. Police entry was consensual and peaceful. Applying the *White* factors, we find exigent circumstances were present.

•■ In light of our determination that the trial court could properly conclude that the police had probable cause to arrest defendant and had received voluntary consent to enter the defendant's girlfriend's residence, we need not address defendant's argument that his in-custody oral and written statements should have been suppressed as the result of an illegal arrest. Defendant's voluntary incriminating statements were lawfully obtained at the police station during interrogation, regardless of whether the police had consent to enter defendant's girlfriend's home in order to arrest him, because they had probable cause. *People v. Long*, 208 Ill. App. 3d 627, 635-36, 567 N.E.2d 514, 519-20 (1990). The statements were properly admitted at trial.

Defendant lastly argues that he suffered ineffective assistance of counsel when defense counsel failed to object to the State's eliciting of harmful hearsay from the police witnesses, himself elicited incriminatory inadmissible hearsay from the police witnesses, and then mentioned the hearsay in opening and closing arguments, thereby denying defendant his right to confront and cross-examine. Defendant asserts that the only actual admissible evidence linking him to the offenses consisted of his postarrest oral and written inculpatory statements and that defense counsel made defendant's conviction more probable with the harmful hearsay from the nontestifying codefendants and police informant and improper, prejudicial argument to the jury.

■ In order to establish ineffective assistance of counsel, defendant must prove that (1) his counsel's performance was deficient and (2) he was prejudiced by that deficiency. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); see also *People v. Albanese*, 104 Ill. 2d 504, 525-26, 473 N.E.2d 1246, 1255 (1984) (adopting the *Strickland* standard for use in Illinois). Although both prongs of the test must be satisfied, an ineffective assistance claim may be disposed of on the prejudice grounds alone, without an examination of whether counsel was deficient. *People v. Munson*, 171 Ill. 2d 158, 184-85, 662 N.E.2d 1265, 1276 (1996). To demonstrate prejudice, defendant must "demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *People v. Munson*, 171 Ill. 2d at 184-85, 662 N.E.2d at 1276. A "reasonable probability" exists if that probability sufficiently undermines confidence in the outcome of the trial. *Strickland v. Washington*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. To succeed on any ineffective assistance claim, defendant must overcome the strong presumption that the challenged conduct falls within the realm of sound trial strategy. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. When considering an ineffective assistance claim, a reviewing court must look to counsel's total performance and not focus solely on isolated acts. *People v. Whittaker*, 199 Ill. App. 3d 621, 627, 557 N.E.2d 468, 471 (1990).

Our examination of the trial record reveals that the testimony defendant complains of was not hearsay because it was not offered for the truth of the matter asserted. *People v. Topps*, 293 Ill. App. 3d 39, 43-44, 687 N.E.2d 106, 109 (1997). Further, this court has held:

> "[T]estimony by a police officer regarding investigatory procedures that reveals the occurrence of a conversation with a co-offender, but not its contents, is not hearsay [citations]. Such testimony is admissible even if the jury could conclude that police began looking for defendant as a result of their conversation with nontestifying witnesses, 'as long as the testimony does not gratuitously reveal the substance of [the nontestifying witnesses'] statements and so inform the jury that they told the police that the defendant was responsible for the crime.' " *People v. Topps*, 293 Ill. App. 3d at 45, 687 N.E.2d at 110, quoting *People v. Henderson*, 142 Ill. 2d 258, 304, 568 N.E.2d 1234, 1256 (1990).

The police witnesses' testimony regarding how they ran the lineup, how they determined that five people were involved in the hijacking, and how they were led to defendant necessarily included discussion of the codefendants. However, they did not divulge the actual statements made by the codefendants. The testimony was only offered to explain the investigatory steps that police took. This does not constitute hearsay.

Similarly, the testimony that defense counsel elicited from Assistant State's Attorney Grapsas on cross-examination did not constitute hearsay. Assistant State's Attorney Grapsas testified that he let defendant know that the other defendants were in custody and had made statements and "what the other defendants were stating about [defendant's] involvement in these two murders." Assistant State's Attorney Grapsas did not reveal the substance of those statements. The jury could draw its own inferences about what the codefendants claimed defendant's involvement was. There was no inadmissible hearsay in Assistant State's Attorney Grapsas testimony.

•■ Since there was no inadmissible hearsay in the police witnesses' or Assistant State's Attorney Grapsas' testimony, defense counsel could not have properly objected to the testimony on hearsay grounds and his performance was not deficient in that regard. Further, our examination of the record shows that, even if counsel's performance with regard to the hearsay testimony had been deficient, his overall defense was diligent and skillful.

Assuming, *arguendo*, that defense counsel's performance was deficient, defendant would be hard-pressed to prove that he was prejudiced by that deficiency. Defendant admitted his guilt in voluntary postarrest oral and written statements. The record shows that the details defendant provided in those statements were corroborated by the physical evidence and eyewitness testimony presented at trial. In addition, at defense counsel's behest, the jury received a limiting instruction that the statement of "one co-defendant may not be considered against another," which served to temper any possible prejudice from the testimony at issue. Defendant cannot show that, but for his counsel's performance, the outcome of the trial would have been any different.

For the foregoing reasons, we affirm the decision of the trial court. The State is granted its costs and we incorporate as part of this judgment a fee of $100 for defending this appeal and an additional fee of $50 for presenting oral argument.

Affirmed.

O'BRIEN, P.J., and O'MARA FROSSARD, J., concur.