2020 IL App (1st) 170785-U

SECOND DIVISION
January 14, 2020

No. 1-17-0785

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 11 CR 18264 (01) |
| | ) | |
| JOHN GRANAT, | ) | The Honorable |
| | ) | Neil J. Linehan, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

*HELD*: Trial court properly denied defendant's motion to quash arrest and suppress evidence where there was sufficient probable cause for defendant's warrantless arrest, as the totality of the circumstances present to police at the time justified belief that his parents were murdered and that he was the perpetrator.

¶ 1 Following a jury trial, defendant-appellant John Granat (defendant) was convicted of first degree murder and was sentenced to natural life in prison. He appeals, contending that the trial court erred in denying his motion to quash arrest and suppress evidence where police arrested him without a warrant or probable cause and based only on a hunch that he was involved in the instant crime. He asks that we reverse his conviction outright, or that we reverse his conviction and remand for a new trial. For the following reasons, we affirm.

¶ 2 BACKGROUND

¶ 3 Defendant was charged, in part, with several counts of first degree murder of his parents, John, Sr., and Maria Granat, which took place in the home they shared with defendant in Palos Park, Illinois. Defendant was 17 years old at the time.

¶ 4 Before trial, defendant moved to quash his arrest and suppress evidence, insisting that police did not have sufficient probable cause to arrest him. At a hearing on his motion, detective Stephen Moody of the Cook County Sheriff's Police Department testified that on the morning of September 11, 2011, he was dispatched to defendant's house following a report of two dead bodies. Upon his arrival, detective Moody spoke to three police personnel responders who were present at the scene. First, detective Moody spoke to officer Brian Zych of the Cook County Sheriff's Police Department, who informed him that defendant was the only potential witness to the murders. Officer Zych told detective Moody that defendant recounted to him that he (defendant) had woken up that morning, gone upstairs to get his parents for church, found the house ransacked and discovered them dead. Officer Zych notified detective Moody that there were no signs of forced entry into the home, as there were no broken windows and all the doors were locked from the inside save the rear service door to the garage, which was the door defendant exited when police arrived. Officer Zych

also apprised detective Moody of his observation that, as he spoke to defendant, defendant was not crying nor was he at all emotional but, rather, had a "calm, very average" demeanor, "like nothing had occurred."

¶ 5        Detective Moody testified that he next spoke to Cook County Sheriff's Officer Elizabeth Hogan, who had also responded to the scene. Officer Hogan told detective Moody that she had spoken to defendant, who had recounted to her that he had been home all night with his parents and they had gone to bed at about 11 p.m. Defendant explained to officer Hogan that he had slept in the basement and that he was a "hard sleeper," so he did not hear anything but awoke to find the upstairs ransacked and his parents dead in bed. Officer Hogan also conveyed to detective Moody two comments defendant made to her that she found "unusual;" first, defendant stated to officer Hogan that he would now have to take over the family business "so 20 people would not lose their jobs;" and second, defendant asked officer Hogan if the fire department was going to "clean up the mess" in the house because he wanted to remain living there and did not want to have to move out. Officer Hogan described to detective Moody defendant's demeanor during their conversation as "calm, not emotional at all" and noted that he "wasn't crying, or anything like that." And, she made detective Moody aware of the fact that the pants defendant was wearing were new, as evidenced by a size tag still attached to them.

¶ 6        Detective Moody further testified that he spoke to Palos Heights Police Officer Christopher Hodorowicz, who was also at the scene. Officer Hodorowicz told detective Moody that at approximately 5:18 a.m. that morning, he had pulled defendant over in his car near 122nd Street and Harlem Avenue as part of a traffic stop because his rear license plate light was out. Officer Hodorowicz recounted to detective Moody that when he asked

defendant for his license and insurance, defendant mumbled that he was coming from a friend's house in Bridgeview. When defendant opened his glove box to get his information, officer Hodorowicz noticed a water bottle filled with a yellowish liquid. Officer Hodorowicz asked defendant what was in the bottle, and defendant told him it was chlorine for "his pool." However, detective Moody testified that he observed that defendant's residence did not have a pool, and he noted that chlorine is commonly used to clean blood. Officer Hodorowicz noted to detective Moody that the vehicle in the driveway at the scene was the same vehicle he had curbed defendant in earlier that morning.

¶ 7    Detective Moody additionally testified that defendant was wearing dark jeans, a sleeveless shirt with his armpits exposed, and a sleeveless coat vest, the same attire he was wearing when he had been pulled over earlier that morning by officer Hodorowicz and attire detective Moody did not believe was typical for church. Based on this, as well as on the peculiar questions defendant had asked officer Hogan, his unusual demeanor as viewed by officers Hogan and Zych, his lie about being home asleep all night, and the presence of the chlorine-filled water bottle in his car just hours earlier, detective Moody asked police personnel at the scene to request defendant's presence at the police station. Officer Hogan asked defendant to accompany her; he agreed and she transported him to the station.

¶ 8    Detective Moody further averred that, in the meantime, he and his partner went to the dispatch center in Palos Heights to listen to the 911 call defendant had made that morning. Upon hearing the recording, detective Moody found several inconsistencies. For example, defendant initially told the dispatcher that he had gone upstairs to wake his parents for church and found them drowning in their own blood. Yet, he later told the dispatcher that he had not seen his mother, only his father, and he did not know where she was. Defendant

continuously repeated that he was a heavy sleeper and could not hear anything from where he slept in the basement. And, when the dispatcher asked defendant how many people lived in the house, defendant responded only that they had been robbed in the past--an answer detective Moody found to be "unusually nonresponsive."

¶ 9    Detective Moody testified that, when he arrived at the station, he saw defendant sitting in the lunchroom watching television; he appeared "[n]ormal, calm." At this point, detective Moody saw the size tag still on defendant's new pants, as officer Hogan had described at the scene. Detective Moody decided to question defendant in an interview room and, when he patted him down before going into that room per police procedure, detective Moody recovered $5,163, including 50 $100 bills, in his wallet. Detective Moody stated that he mirandized defendant, never handcuffed him, and interviewed him on and off for a few hours.

¶ 10    Following the close of this pretrial testimony, the trial court denied defendant's motion to quash arrest and suppress evidence. The court began its colloquy by reviewing all the evidence presented. First, it noted that defendant had told responding officers he had been home all night, and that officers discovered all the doors locked from the inside, no forced entry, and very violent murders. The court concluded that this evidence signified that whoever the offender was had permission to be in the home. Next, the court noted that, in direct contrast to his story to police, defendant had been stopped for a traffic violation that very morning and had a considerable about of chlorine in his car which he said was for his pool, yet his home had no pool. The court commented that chlorine can be used to both clean up a bloody crime scene and to clean up a person involved in a bloody crime. With respect to defendant's clothes, the court stated that while "strange outfits" have certainly been worn

to church, defendant's was "certainly" one that "would be out of place;" the court also focused on the fact that his pants were new and still bore the size tag. The court further noted the discrepancies in defendant's 911 call, his unemotional demeanor, his "matter-of-fact questions" to police, and his failure to ask questions regarding what had happened to his parents. Finally, the court reviewed the testimony with respect to the money recovered on defendant who, the court noted, was "a 17-year-old on his way to church with over $5,000 in cash in his wallet, and that cash in particular is in the amounts of 50 $100 bills."

¶ 11 The court concluded its colloquy by stating that "police at that time had a tremendous amount of information that was inconsistent with someone that was sleeping in the basement, but rather someone who had been involved in the incident that had taken place." Again citing the evidence presented, the court found that it "actually was consistent with someone that was hiding or trying to fool the police," and that there was "no question" that, with all this evidence at the time, police "certainly had a right to detain" defendant. Accordingly, the trial court denied defendant's motion to quash arrest and suppress evidence.

¶ 12 Defendant's cause then proceeded to trial. Detective Moody testified with respect to his interviews with defendant at the police station. He noted that as they spoke, defendant's version of events began to change. Upon confronting him about the inconsistencies, defendant eventually acknowledged that on the morning of the murders, he had been at the home of his friend, Christopher Wyma, and mentioned two other friends, Mohammad Salahat and Ehab Qasem, suggesting Qasem was responsible for the murders. Detective Moody interviewed Wyma, Salahat and Qasem,[1] obtaining statements from, and consents to

---

[1] Wyma was convicted of murder in relation to this matter and was sentenced to life in prison; his appeal is currently pending in our court. See *People v. Wyma*, No. 1-17-0786. Qasem pled guilty to one count of murder in exchange for 40 years in prison and his truthful testimony against defendant and Wyma. Salahat is currently serving 35 years in prison on one count of murder.

search the cell phones of, each of them. Detective Moody recovered cell phone records for defendant, Wyma, Salahat and Qasem, and sent them to the Secret Service for analysis. After receiving the results, Detective Moody reinterviewed Wyma, Salahat and Qasem and, eventually they, along with defendant, were charged.

¶ 13       Officers Zych, Hogan and Hodorowicz testified consistently with detective Moody's testimony from the hearing on defendant's motion to quash arrest and suppress evidence. They corroborated much of detective Moody's testimony, except that officer Hodorowicz testified at trial that defendant told him during the traffic stop that the chlorine in the water bottle in his car was for a friend's pool. Two dispatchers testified with respect to defendant's 911 call, which was played for the jury and admitted into evidence.

¶ 14       The State's main witness at trial was Qasem, who recounted that he, defendant and Wyma planned and executed the murders of defendant's parents. Qasem testified that he had a good friendship with Wyma; Wyma introduced him to defendant and Qasem introduced them to Salahat, and the four would spend time together often. Qasem saw defendant give Wyma money from time to time and, during the summer of 2011, defendant gave Qasem and Wyma $400 each for work they did at his parents' apartment complex. Also one day that summer, defendant gave Qasem $2,300 in $100 bills for no particular reason, and then took Qasem and Wyma shopping at a mall and bought them $600 in clothing, for which he paid in cash and all in $100 bills. Qasem testified that during this outing, defendant asked him if he liked this lifestyle and commented to him and Wyma, "you know, if my parents were dead, everything is in my name." Qasem recounted that only a week prior, defendant had also complained about his parents, stating, "I'm tired of them, I just want my parents dead. They

7

only let me out of the house when I go to school, gym or work. I'm just tired of them, I just want 'em dead." Qasem thought this was a joke, as defendant and Wyma were laughing.

¶ 15    Qasem testified that he did not see much of defendant the rest of that summer because defendant had been grounded by his parents, but they remained in contact via text. In late August 2011, defendant texted Qasem and asked if he could obtain a machine gun, grenade launcher, bulletproof vest and silencer; Qasem answered that he could not. Wyma also asked Qasem for the same items, and Qasem told him could not get them. Qasem and Wyma then asked Salahat if he could get a gun with a silencer, because defendant wanted to kill his parents. At first, Salahat refused to participate, but Qasem and Wyma convinced him otherwise by reminding him how they received their new clothes. Salahat tried to purchase a gun with a silencer, but when he could not, Wyma suggested that they use a machete and metal baseball bats. Salahat agreed only to be the driver, and Qasem and Wyma continued to keep in contact with defendant via text, as he was still grounded.

¶ 16    Qasem further testified that on September 10, 2011, he was at Wyma's house with Wyma, Salahat and some friends. Defendant arrived and the four of them talked in Wyma's driveway. Qasem stated that defendant was frustrated and talking fast, telling the group that he wanted his parents dead that day; defendant then left. Qasem and Salahat also left for a while, but upon returning to Wyma's house, they were confronted by Wyma telling them that defendant wanted the murders done that day. Qasem and Salahat left again, but returned after receiving a text from Wyma. Wyma explained that defendant was going to call him on Skype later that night about a "concert;" this was the code word indicating that his parents would be asleep and that they were to go to his house to kill them.

¶ 17     Qasem averred that at about 1:46 a.m. on September 11, 2011, defendant called Wyma via Skype and used the code word. Wyma got the baseball bats and Salahat drove Qasem and Wyma to defendant's house. Salahat dropped them off, and Qasem told Salahat to drive around until he gave a signal to pick them up. Salahat then left. Defendant was waiting outside his house and signaled Qasem and Wyma from behind a bush with a light. Defendant led them toward the garage; he opened the rear service door and told them that his parents were asleep upstairs. Qasem saw multiple stacks of money on a counter in the garage, all containing $100 bills.

¶ 18     Qasem recounted that as he and Wyma went upstairs, the bats they were carrying clinked together, so they ran back down to the garage. Defendant was there counting money into piles and told them to go back upstairs. Qasem and Wyma went to the victims' bedroom. Once inside, Wyma went to the left side of the bed and Qasem went to the right side of the bed; they raised the bats and began striking the victims while aiming for their heads. John, Sr., was able to get out of bed and attempt to defend himself, whereupon Qasem stopped striking Maria and went to help Wyma by striking John in the face with his bat. John fell to the ground and stopped moving. Maria was on the bed making a gurgling noise. Qasem and Wyma placed a pillow over her head and struck her a few more times.

¶ 19     Qasem testified that he and Wyma went back to the garage and found defendant still counting money. Wyma told defendant Maria was still breathing. Defendant gave Qasem a knife from a shelf in the garage and told them to "take care of it." Qasem and Wyma went back upstairs and Qasem tried to give the knife to Wyma, who refused. Qasem then stabbed Maria, who was still making gurgling noises, in the stomach. Qasem and Wyma returned to the garage and put the bats, knife and gloves they were wearing into a black garbage bag

defendant provided. Defendant took Qasem and Wyma to the bathroom and helped them clean blood off their faces, and then told them to search the attic and his parents' bedroom for a safe, while he searched the home office. Qasem did not find a safe, but he took Maria's cell phone while Wyma took a jewelry box and a bag of coins. Qasem then called Salahat to pick them up. Defendant put cash into a bag and put it in his car. Salahat arrived, and Salahat, Qasem and Wyma drove to Wyma's house.

¶ 20    Qasem averred that defendant arrived at Wyma's house about 20 minutes later and gave $4,000 to Salahat, $8,000 to Qasem, and $8,000 to Wyma, plus another $5,000 to Wyma to give to his mother. Wyma instructed defendant to act normal and to make sure he opened a window at his home so that the events looked like a robbery; he also told him to tell police he went to wake his parents and found them dead. The group further conferred about what story to tell police. Defendant left, and Wyma, Qasem and Salahat wiped the bats and knife with Clorox wipes. They tried to burn them, the gloves and garbage bag as well, but when they failed, Wyma put the bats under his porch and eventually moved those to a forest preserve and threw the knife into a wooded area.[2]

¶ 21    Qasem further testified that once the group dispersed, he went home to sleep. Later, detectives arrived at this house and he agreed to speak to them, giving them the story the group had prepared, which was that he, Wyma and Salahat had gone to dinner that night, went back to Wyma's house, delivered marijuana to someone on 55th Street and Harlem Avenue, and returned to Wyma's house to play video games and sleep. Qasem continued to promulgate this story until October 2011, when detectives confronted him with inconsistencies. At this point, Qasem concocted another story before giving his testimony,

---

[2] These were later recovered by police.

telling police that the plan had been to simply rob defendant's parents and that defendant had hit them with a baseball bat before he and Wyma arrived at their house.

¶ 22    Other evidence presented at trial included the testimony of Stephanie Wydra, as well as forensic, autopsy and cell phone data. Briefly, Wydra, Wyma's girlfriend in September 2011, testified that she knew Wyma and defendant were good friends and she had often heard defendant talk about how much he hated his parents and wanted them dead, but she did not take him seriously. She averred that she was among the group of friends at Wyma's house the day before the murders. She saw defendant arrive and he, Wyma, Qasem and Salahat talking in the driveway when she overheard one of them say, "this is happening tonight, it's on." The next day, after she heard defendant's parents had been murdered, she saw Wyma, who she described as nervous and agitated. While at his house, Wydra found $15,000 in $100 bills in his guitar case. Wyma gave her a T-shirt from under his bed, told her there was blood on it and asked her to burn it. She took the shirt home, saw blood spatter on it and eventually turned it over to police.

¶ 23    Additional evidence indicated that there were no fingerprints suitable for analysis on the two baseball bats that were found by police, nor was there any blood on the bats or knife. Blood present on the T-shirt Wydra turned over matched John, Sr., and DNA on the collar matched Wyma. Further, John's cause of death was homicide via multiple blunt force injuries, including bruises, lacerations and fractures of his skull, nose, and jaw resulting in hemorrhaging. Maria suffered the same injuries, and had also been stabbed in her torso, hand and lip more than 20 times. Finally, the following evidence was adduced from defendant, Qasem, Wyma and Salahat's cell phones with respect to the morning of September 11, 2011. At 1:46 a.m., defendant's phone was near his house when he received a text from Wyma's

phone. At 3:12 a.m., defendant's phone was still near his house; between 3:12 a.m. and 3:23 a.m., Wyma's phone was pinged near defendant's house; between 3:04 a.m. and 3:16 a.m., Qasem's phone was pinged near defendant's house; and between 3:04 a.m. and 3:23 a.m. Salahat's phone was pinged near defendant's house. Later, at 3:41 a.m., 4:41 a.m. and 5:26 a.m., defendant's phone was near Wyma's house, and between 4:00 a.m. and 4:21 a.m., Wyma's phone was also near his own house. And, a Skype call had occurred between defendant's computer and Wyma's computer between 1:46 a.m. and 1:57 a.m.

¶ 24    At the close of trial, the jury found defendant guilty of first degree murder, and he was sentenced to natural life in prison.

¶ 25                                   ANALYSIS

¶ 26    Defendant's sole contention on appeal is that the trial court erred in denying his motion to quash arrest and suppress evidence. He asserts that, without a warrant or probable cause, police improperly arrested him on nothing more than a vague hunch that he was involved in his parents' murders, which consisted only of a "minor lie," a "perceived" inconsistency in his 911 call, his presence at home and a subjective belief that he was not exhibiting sufficient signs of shock. Essentially, he claims that police did not have sufficient evidence to justify the belief that he was the perpetrator. He further asserts that, without his illegally-obtained post-arrest statements, there was no evidence to link him to the crimes and anything obtained from those statements should have been inadmissible. We disagree.

¶ 27    A warrantless arrest is valid if police have probable cause to arrest. See *People v. Sims*, 192 Ill. 2d 592, 614 (2000); accord *People v. Wetherbe*, 122 Ill. App. 3d 654, 657 (1984) (while warrant is generally required for arrest, a warrantless arrest is proper if probable cause exists). Probable cause to arrest exists when the facts known to the officer at the time of the

arrest are sufficient to lead a reasonably cautious person to believe a crime has occurred and that the person to be arrested committed the crime. See *People v. Wear*, 229 Ill. 2d 545, 563-64 (2008); see also *People v. Chapman*, 194 Ill. 2d 186, 215-16 (2000); *People v. Williams*, 305 Ill. App. 3d 517, 523 (1999). Whether probable cause existed is not a legal or technical determination, but one of practicality and common sense which analyzes the totality of the circumstances at the time of arrest. See *Sims*, 192 Ill. 2d at 615; *People v. Robinson*, 299 Ill. App. 3d 426, 431 (1998); see also *People v. Love*, 199 Ill. 2d 269, 279 (2002) (totality of circumstances is central focus for determination of existence of probable cause). Though more than mere suspicion is required to justify a warrantless arrest, evidence beyond a reasonable doubt or sufficient to sustain a conviction is not. See *Sims*, 192 Ill. 2d at 615; see *Chapman*, 194 Ill. 2d at 218 (determination of probable cause rests only on probability of criminal activity); accord *People v. Lee*, 214 Ill. 2d 476, 485 (2005). The defendant has the ultimate burden of showing a lack of probable cause. See *Williams*, 305 Ill. App. 3d at 523.

¶ 28 We further note that in reviewing a trial court's decision on a motion to quash and suppress based, as here, on a claim of lack of probable cause, we are presented with a mixed question of law and fact. See *People v. Novakowski*, 368 Ill. App. 3d 637, 640 (2006). Therefore, we apply a two-part standard of review. See *People v. Grant*, 2013 IL 112734, ¶ 12. That is, while we accord great deference to the trial court's factual findings and credibility determinations and will reverse those only if they are against the manifest weight of the evidence, we review *de novo* the trial court's ultimate determination of whether the evidence should have been suppressed. See *Grant*, 2013 IL 112734, ¶ 12; accord *People v. Pitman*, 211 Ill. 2d 502, 512 (2004)*; Novakowski*, 368 Ill. App. 3d at 640.

13

¶ 29        Essentially, then, we are called in this cause to conduct a review of the totality of the circumstances to determine whether probable cause existed when detective Moody detained defendant in the interview room, following defendant's agreement to go to the station and speak to police. Upon our analysis of the facts at hand, we find, just as the trial court did, that the totality of them, as known to detective Moody at the time of defendant's arrest, clearly supported a finding of probable cause.

¶ 30        We begin with the scene of the crime itself, which consisted of two violent and bloody murders. When detective Moody arrived, he spoke with three separate first responders. Officer Zych informed him that defendant had told him he woke up that morning, went upstairs to get his parents for church and found the house ransacked and his parents dead. Officer Zych reported, however, that there were absolutely no signs of forced entry into the home—a home shared only by the victims and defendant; there were no broken or opened windows and all the doors were locked from the inside, except for the rear service door to the garage which was the door defendant exited when he came out of the house to meet police upon their arrival. And, office Zych told detective Moody that, as he spoke to defendant about his parents' murder, he was neither crying nor emotional but, rather, displayed a "calm, very average" demeanor "like nothing had occurred." Next, detective Moody spoke to officer Hogan at the crime scene. Confirming officer Zych's observations about defendant's "calm" demeanor, she informed detective Moody that defendant told her he had been home all night with his parents, had gone to bed in the basement and did not hear anything upstairs. Officer Hogan also shared with detective Moody two comments defendant made to her which she found "unusual," namely, that he was now going to have to take over the family business and that he wanted to stay living in the house and was hoping the fire department

would "clean up the mess." And, officer Hogan told detective Moody that the pants defendant was wearing were new, as she saw the size tag still attached to them. Lastly at the scene, detective Moody spoke to officer Hodorowicz, who reported that earlier that morning, he had pulled defendant over in his car in a traffic stop. When he asked defendant for his license and insurance, defendant was mumbling incoherently about having been at a friend's house. Defendant then opened the glove box, which contained a water bottle full of a yellowish liquid; defendant told officer Hodorowicz it was chlorine to clean his pool.

¶ 31      Accordingly, at the time detective Moody canvassed the scene and before he had even met defendant, several practical facts were obvious to him. The crime scene was very violent and bloody, and the house had been ransacked; yet, there were no signs of forced entry into the home, where only the victims and defendant lived. As he testified, this led detective Moody to believe that the perpetrator was someone who had permission to be in the home. Next, detective Moody had evidence that defendant had completely lied about his whereabouts. He had told officers Zych and Hogan he was at home with his parents all night, had gone to bed in the basement at 11 p.m., and went upstairs that morning to wake his parents for church. However, officer Hodorowicz performed a traffic stop of defendant at 5:18 a.m. that very morning, and defendant told him he had been at a friend's house in Bridgeview. In addition to this lie, defendant was in immediate possession of a bottle of chlorine, which he told officer Hodorowicz was for cleaning his pool. Yet, detective Moody noted while at the crime scene that defendant's house did not have a pool and, as he testified, chlorine is a chemical commonly used to clean blood from a crime scene or off a perpetrator. Moreover, both officers Zych and Hogan had told detective Moody that they found defendant's demeanor "unusual." His parents had just been violently murdered and the

15

house ransacked while he sleeping in the basement, yet defendant spoke to police calmly and without emotion, making matter-of-fact statements about having to take over the family business and asking if the fire department was going to clean up "the mess" so he could continue living in the house. Detective Moody testified that these statements were out of place in his experience. Further, detective Moody was able to view defendant's clothing at the scene. Again, defendant had told officer Zych that he had gone upstairs that morning after getting ready to wake his parents for church. Yet, detective Moody observed that defendant was wearing jeans, a sleeveless shirt with his armpits exposed, and a sleeveless coat vest—attire detective Moody did not believe was typical for church.

¶ 32    The next set of facts to be examined within the totality of the circumstances here comes from defendant's 911 call. Having gathered the information at the scene, and again before ever speaking to defendant, detective Moody investigated the 911 call defendant placed that morning. Upon listening to it, he discovered inconsistencies. That is, detective Moody noted that defendant initially told the dispatcher he had gone upstairs to wake his parents for church and found them both drowning in their own blood in their bedroom. However, later in the call, defendant told the dispatcher that he had not seen his mother and did not know where she was, and that he had only seen his father in the bedroom. Detective Moody found this to be significant. Additionally, detective Moody concluded that some of defendant's comments during the 911 call were unusual. He noted that, in the call, defendant continuously repeated that he was a heavy sleeper and could not hear anything from where he slept. And, detective Moody testified that he found defendant's answer that the house had been robbed in the past to the dispatcher's basic question of how many people lived in the house to be "unusually nonresponsive."

16

¶ 33    Finally, we must consider the facts detective Moody encountered when he finally arrived at the police station and prepared to interview defendant, who, again, had agreed to talk to police and was waiting at the station voluntarily. Detective Moody testified that when he arrived, defendant was sitting in the lunchroom watching television with a "[n]ormal, calm" demeanor. Next, detective Moody noticed that the pants defendant was wearing were, indeed, new. Just as officer Hogan had described at the scene, detective Moody saw that defendant's pants still had the size tag on them. Finally, while patting defendant down before entering the interview room per police procedure, detective Moody recovered over $5,000 in defendant's wallet, including 50 $100 bills.

¶ 34    When all the circumstances involved in this cause--from the crime scene, from the 911 call investigation and from defendant's presence at the police station--are viewed in their totality, it is clear that probable cause existed for defendant's arrest. As the trial court found, there was a "tremendous amount of information that was inconsistent" with someone who was sleeping in the basement while his home was ransacked and his parents were violently murdered, as defendant claimed. Defendant told multiple officers he was home asleep all night. Not only was this a lie, but even before that discovery, it was clear that something was amiss, as there were no signs of forced entry in these very violent murders; the offender had permission to be in the home—a home shared only by defendant and his parents. Additionally, defendant's "alibi" was immediately found to be untrue, as police records showed he had been pulled over in a traffic stop that morning, so he could not have been at home asleep in his basement. During that stop, defendant was found to be in possession of a considerable amount of chlorine which he said was to clean his pool; yet, his house did not have a pool. Moreover, defendant repeated that he had woken up that morning, gotten

17

dressed and went to wake his parents up so they all could attend church. However, as the trial court noted, his clothing and possessions "certainly" were not typical for a trip to church: he was wearing a sleeveless shirt with his armpits exposed, his pants were new with the tag still attached, and he had over $5,000 in his wallet, including 50 $100 bills. And, not only were there discrepancies in his 911 call to police, but his demeanor throughout the investigation was consistently unemotional and matter-of-fact, and he never asked questions regarding what happened to his parents. These circumstances were more than sufficient to lead a reasonably cautious person, namely, detective Moody, to believe a crime had occurred and that defendant committed that crime. See, *e.g.*, *People v. Tisler*, 103 Ill. 2d 226, 237 (1984) (police officer's factual knowledge, based on prior law enforcement experience, is relevant to probable cause determination).

¶ 35 Defendant's arguments to the contrary are meritless. Relying principally on *People v. Haymer*, 154 Ill. App. 3d 760 (1987), defendant claims that his arrest was not based on probable cause but, instead, on detective Moody's "vague hunch" and "illegal 'expedition for evidence.' " 154 Ill. App. 3d at 768. He insists that "the only concrete information" against him was no sign of forced entry into the house and his lie about being home all night. He then refers to the inconsistencies in his 911 call as merely "perceived" and detective Moody's references to his demeanor as "entirely subjective."

¶ 36 However, defendant's characterization of the evidence against him in relation to his motion to quash arrest and suppress evidence is wholly incorrect, for many reasons. In his review of the evidence known to detective Moody at the time of his arrest, defendant cites only certain particular pieces and circumstances, namely, the lack of forced entry and his lie about being home asleep all night, and claims that these facts, alone, are not enough to

18

establish probable cause. While this may or may not be true, such a statement is irrelevant and completely unsupportive of his claims on appeal precisely because, in his review of the evidence, he omits several critical facts. That is, he never speaks to his clothing and the amount and denominations of money he had on his person at the time of his arrest and how these lay in direct contradiction to his story that he was on his way to church that morning with his parents. Moreover, he does not address the inconsistencies in his 911 call, other than to say they were "significantly overstated." Yet, detective Moody found them to be critical; defendant first told the dispatchers he found his parents "drowning in their own blood," but soon after, said he did not know where his mother was and that he had not seen her, followed by evasive answers to simple, factual questions. Defendant also chooses to ignore in his analysis that he was pulled over by police, not only in direct contravention of his alibi, but also with a significant amount of chlorine in a water bottle in his glove box, which he said was to clean his pool—a pool he does not have. While defendant might be correct that each individual fact and circumstance here, standing alone, may not confer probable cause, this is not the proper way to analyze the legal question at hand. In other words, to determine whether probable cause existed at the time of defendant's arrest to believe that a crime was committed and that he committed that crime, a review of the totality of the circumstances presented must be undertaken, not simply select pieces of the whole. When that is done in the instant cause, it is clear, in all practicality and common sense, that probable cause indeed existed at the time of defendant's arrest.

¶ 37    Moreover, defendant's reliance on *Haymer* is entirely misplaced. In that case, the victim was shot and later died. The only evidence police were able to gather was from a witness who said he saw two or three black men shoot the victim and leave in a vehicle; the witness'

girlfriend wrote down the license plate number, which matched a vehicle belonging to the defendant. Police then questioned the defendant, who told them he had been near the scene with his girlfriend and heard shots, but they left the area because they did not want to get involved. Without any other information, police questioned the defendant again and asked if he would take a polygraph. The defendant agreed, and he repeated the same version of events. When the polygraph examiner told police the defendant failed the polygraph, police detained him and attempted to conduct further investigation. Without more, and after his refusal to change his version of events upon their asking, police arrested defendant. See *Haymer*, 154 Ill. App. 3d at 762-63. At trial, the defendant moved to quash his arrest and suppress evidence, and the trial court granted this upon its conclusion that police lacked probable cause to arrest him. See *Haymer*, 154 Ill. App. 3d at 767. On appeal, our court affirmed. In reviewing the totality of the circumstances at the time of arrest, the *Haymer* court noted that the only information police had was that the defendant's car was identified at the scene, he acknowledged he was nearby, and he had failed a polygraph. See *Haymer*, 154 Ill. App. 3d at 768. This fell very short of probable cause, since there was "no reliable evidence" that the defendant himself had participated in the crime. *Haymer*, 154 Ill. App. 3d at 768. Instead, our court concluded that, as police had no new information between the time they first questioned him and the time of his arrest, police arrested the defendant solely "for the purpose of conducting an expedition for evidence in hope of obtaining information upon which to predicate probable cause to justify an arrest," which was wholly improper. *Haymer*, 154 Ill. App. 3d at 768.

¶ 38    The instant cause is completely distinguishable from *Haymer*. It was clear in *Haymer* that the police did not have any real evidence to link the defendant to the commission of the

crime. All they knew was that the defendant's car was at the crime scene, he was nearby, and he failed a polygraph; other than that, the defendant's version of events never changed, and there were no other circumstances to suggest he committed the crime. Police admittedly arrested the defendant in order to conduct their investigation. In contradistinction, in the instant case, detective Moody clearly had more than mere suspicion at the time he arrested defendant. We have already discussed this at length; the lack of forced entry, defendant's lie to police regarding his whereabouts, his possession of chlorine, the inconsistencies in his 911 call, his evasive answers to police personnel, his unusual questions and demeanor at the scene and police station, his clothing and the amount of money he was carrying all demonstrate that probable cause for his arrest was, in contrast to *Haymer*, abundant.

¶ 39    Additionally, the totality of the circumstances shows that detective Moody certainly did not arrest defendant in order to conduct an "expedition for evidence," as occurred in *Haymer*. Contrary to defendant's characterization, detective Moody had accumulated a large amount of significant and concrete evidence linking him to the commission of the crimes long before the two ever met. Prior to defendant's arrest, detective Moody spoke to three first responders who provided him with details regarding his unusual demeanor, his false alibi, his possession of chlorine, his strange questions to police and his clothing that was out of line with his explanation of why and how he found the victims. Next, detective Moody viewed the scene before speaking with defendant and discovered that there was no forced entry in the home shared only by the victims and defendant, that his explanation for possessing the chlorine was a lie as there was no pool at the house, and that blood which would be cleaned with chlorine was everywhere in the victims' bedroom. Detective Moody also investigated defendant's 911 call before meeting with him, finding several inconsistencies and evasive

21

answers he determined to be significant. And, finally, detective Moody observed defendant before speaking to him, noticing that his pants were new, that his outfit did not correspond to his story, and that he was carrying an extraordinary amount of cash on his person in unusual denominations for a 17-year-old on his way to church. Clearly, detective Moody did not arrest defendant for the purpose of conducting some sort of expedition for evidence in the hope of justifying probable cause. Instead, detective Moody already performed a thorough investigation yielding a solid link between defendant and the commission of his parents' murders before even speaking to him, which, in turn, provided the necessary probable cause to properly arrest him.

¶ 40    Accordingly, we hold that, based on the record before us, and when considering the totality of the circumstances presented, there was sufficient probable cause for defendant's warrantless arrest and, thus, we find no error on the part of the trial court in denying defendant's motion to quash arrest and suppress evidence.

¶ 41                                    CONCLUSION

¶ 42    For all the foregoing reasons, we affirm the judgement of the trial court.

¶ 43    Affirmed.