2021 IL App (1st) 191088-U

No. 1-19-1088

Order filed August 20, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 11542 |
| | ) | |
| RICKEY DORTCH, | ) | Honorable |
| | ) | Thaddeus L. Wilson, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant was adequately admonished prior to his jury waiver, and there was sufficient evidence to find defendant guilty of first degree murder and aggravated battery beyond a reasonable doubt.

¶ 2    Following a bench trial, defendant Rickey Dortch was found guilty, under a theory of accountability, of two counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)), and two counts of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2014)). He received two consecutive natural life sentences for first degree murder, to be served consecutively to two

concurrent 18-year prison terms for aggravated battery with a firearm. On appeal, defendant contends that he was denied due process when the trial court accepted his jury waiver without adequate admonishments. He further argues his convictions should be reversed because they were not supported by credible testimony. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant and Frank Robinson were charged by indictment with multiple counts of first degree murder, attempt first degree murder, and aggravated battery with a firearm following an August 26, 2015 incident during which Kwamaine Lovette and Kortney Blakes were fatally shot, and Shaquille Rogers and Travelle Washington suffered gunshot wounds.[1]

¶ 5      On May 2, 2016, trial counsel informed the court that defendant was "considering" a bench trial. On August 3, 2016, counsel told the court that defendant was "comfortable and confident" that a bench trial was the "right choice." The matter proceeded to simultaneous trials where defendant was tried by the bench and Robinson by a jury. For defendant, the State proceeded on charges of first degree murder and aggravated battery with a firearm.

¶ 6      Before opening statements, the following exchange occurred:

"THE COURT: Mr. Dortch, do you understand that you have the right to a trial before a jury?

DEFENDANT DORTCH: Yes, sir.

THE COURT: Do you know what a jury trial is?

DEFENDANT DORTCH: Yes, sir.

_____

[1] Robinson is not a party to this appeal.

THE COURT: I have in my hand a jury waiver form, is that your signature at the bottom?

DEFENDANT DORTCH: Yes, sir.

THE COURT: Did you read it or was it explained to you before you signed it?

DEFENDANT DORTCH: Yes.

THE COURT: Do you understand by signing that form you are waiving your right to a trial before a jury and this matter will proceed before me in what is called a bench trial, do you understand that?

DEFENDANT DORTCH: Yes, sir.

THE COURT: Has anyone threatened you or promised you anything to give up your right to a jury trial?

DEFENDANT DORTCH: No, sir.

THE COURT: Are you giving up your right to a jury trial of your own free will?

DEFENDANT DORTCH: Yes, sir.

THE COURT: I'll accept the jury waiver as knowingly and voluntarily given."

¶ 7    Defendant's signed jury waiver is included in the record on appeal. It states, "I, the undersigned, do hereby waive jury trial and submit the above entitled cause to the Court for hearing."

¶ 8    At defendant's bench trial, Shukaria Hampton testified that on August 26, 2015, she was dating defendant and planned to accompany him to court in Wisconsin. That morning, they were in defendant's dark-colored four-door sedan when he received a phone call. Thereafter, they drove to Lexington Street and Sacramento Avenue where they picked up Robinson, who got into the

backseat. Robinson's hair was in "dreads," and he had a bird tattoo on his cheek. Defendant then drove past a park two times. Hampton saw Lovette in the park, but when defendant stopped his vehicle, Hampton's view of the park was blocked.

¶ 9    Hampton testified that Robinson exited the vehicle, covered his face with his shirt, and approached the park. Hampton lost sight of Robinson, but then heard gunshots from the direction that he walked. Robinson ran back and entered the vehicle. Hampton did not remember whether his face was still covered, but he held a firearm and said it was "hot" and "jammed." Defendant drove back to Sacramento and Lexington, where Robinson exited. Hampton did not know what happened to the firearm. Defendant and Hampton then entered a different vehicle and went to Wisconsin. She did not contact the police because she was scared.

¶ 10    Hampton acknowledged that she testified before a grand jury on July 6, 2016, and that she testified at that time that defendant had said, "there they go," when they pulled up to the park. She also testified before the grand jury that Robinson's face was not covered when he ran back to the vehicle he said that "one of them fell." She testified before the grand jury that Robinson had wrapped the firearm, which was black with an extended magazine, in his t-shirt before he exited.

¶ 11    Hampton testified that she had been arrested for possession of a firearm in May 2015, a few months before the shooting in question, and was released on bond, which she violated by traveling to Wisconsin. A month after the shooting, Hampton was arrested for credit card fraud in Indiana by federal authorities. As part of a plea agreement in that case, she agreed to cooperate with authorities, but she did not remember being asked about other offenses and did not disclose the shooting at issue. In April 2016, Hampton entered a guilty plea in federal court and received 6

months of house arrest and 30 months of probation. At the time of trial, she was serving that probation.

¶ 12    Hampton further testified that on July 1, 2016, she was arrested and spoke to Chicago police officers about the events of August 26, 2015. She was given her *Miranda* warnings and told that she had been seen in the suspected vehicle and could "help" herself. Hampton then identified photographs of defendant and Robinson. She was scared that she would be charged with a crime and still had an "open" case for possession of a firearm.

¶ 13    On cross-examination, Hampton testified that a firearm was recovered from her purse on May 14, 2015. When she signed the bond slip, she agreed not to possess firearms, commit crimes, or leave Illinois. However, she continued to engage in credit card fraud four to five times a week in Illinois and Indiana. After being confronted with videotapes showing her using stolen credit cards, Hampton spoke to federal authorities about the credit card fraud. She was charged in federal court and released. After learning that she was named as the leader in the credit card fraud scheme, she asked her attorney to approach federal authorities about a plea. Hampton testified that at a January 26, 2016, proffer meeting, she did not mention the August 2015 shooting.

¶ 14    Hampton further testified on cross-examination that she was arrested on July 1, 2016, and questioned about the August 2015 shooting. She then testified before the grand jury and was permitted by the court to transfer her probation to Las Vegas.

¶ 15    Hampton testified on redirect that the State paid approximately $2,846 in relocation expenses to her mother, and that she relocated out of fear.

¶ 16    Kensey Ross, who was incarcerated at the time of trial for possession of a controlled substance and had narcotics convictions, testified that on August 26, 2015, he was out walking his

dog, when he saw a dark-colored BMW. A man with dreads and a t-shirt over his face exited the vehicle. The vehicle then turned into an alley. Ross observed the man with dreads repeatedly discharge a black firearm with a long clip. The shooter ran back toward Ross. As the man entered the backseat of the vehicle, he removed the t-shirt and Ross saw his face. Ross identified Robinson in court as the shooter, noting that he recognized Robinson's facial tattoo. Ross only saw the back of the driver's head and thought it was a man with short hair. He returned home and spoke to the police later that morning. That afternoon, he identified Robinson in a photographic array. Later, at a police station, Ross gave a videotaped statement.[2]

¶ 17    Kenyon Boyd, who had convictions for driving on a revoked or suspended license and unlawful use of a weapon by a felon, and two other cases pending at the time of trial, testified that in August 2015, he belonged to the Unknown Vice Lords, a faction of the Traveling Vice Lords gang. He denied being on Lexington between Sacramento and Kedzie Avenue on August 26, 2015, or seeing a vehicle containing members of the Gangster Disciples (GD) gang flashing "gang signs" and showing firearms, and was unaware of a conflict between the GD and the Vice Lords gangs. In September 2015, Boyd was arrested, which violated his parole, and he went to prison. There, he spoke to detectives and made a videotaped statement that was published.

¶ 18    In his statement, Boyd stated that on the morning of August 26, 2015, he was near Lexington and Sacramento when GD members "rolled through" showing firearms. Defendant then arrived in a dark vehicle accompanied by his girlfriend, and told Robinson to "grab that." The vehicle was foreign-made, possibly a BMW. Boyd saw Robinson run into a "trap house" where firearms and drugs were stored and emerge holding a firearm with an extended clip. Robinson

_____

[2] This statement was not entered into evidence in defendant's case.

entered the vehicle and left. Around 20 minutes later, the vehicle returned. Robinson exited holding the firearm, and said he "got two of 'em" and to "check out my timeline." Robinson returned the firearm to the trap house and left in a different vehicle. Boyd identified a photograph of Robinson and noted the face tattoo. He came forward because he knew one of the victims and "that shit was wrong."

¶ 19 Boyd also admitted testifying before the grand jury that on August 26, 2015, he was on Lexington between Sacramento and Albany Avenue, when a vehicle arrived containing people who flashed GD gang signs and showed a firearm. A second vehicle arrived containing a GD associate who said, " 'you better learn how to keep your guys in order' " and " 'We could afford a war.' " Defendant and his girlfriend then arrived in a BMW and defendant told Robinson to " 'go grab that.' " Robinson ran into a trap house, returned with a firearm under his shirt with only the extended clip visible, entered the backseat of the vehicle, and left. About 30 minutes later, the vehicle returned, and Robinson exited and said, " 'check your timeline' " and " 'I just scored on two individuals on the other side.' " Robinson returned the firearm to the trap house and left in a different vehicle. Boyd later learned via social media that Lovette, with whom he was previously incarcerated, was a victim, and came forward because Lovette was not "in the streets." On December 9, 2015, Boyd identified defendant in a photographic array. He testified that he knew Robinson from the neighborhood and had seen Robinson "a few times" in that BMW.

¶ 20 During cross-examination, Boyd acknowledged at least nine prior felony convictions, and that he did not know Robinson or defendant. He was arrested on September 20, 2015, and heard people discussing a double murder. At one point a sheriff approached and asked if anyone wanted to help themselves, so Boyd offered to get a "gun." When he was unable to direct authorities to a

firearm, the officer said he could still help himself, mentioned the double murder, and asked if he would speak with officers. Boyd consented. He was transferred to the penitentiary, and on September 28, 2015, met with Chicago police Detective Marc Leavitt and another officer. When Boyd denied being a witness, Detective Leavitt asked whether Boyd would create a statement in exchange for "help" on his case. Boyd agreed and subsequently related a statement they created to an ASA, in a videotaped statement, and before the grand jury. On December 9, 2015, Boyd followed instructions to identify defendant in a photographic array. About a month later, Boyd's motion to quash arrest and suppress evidence was granted in his pending case and he was released from prison. Boyd believed this was due to Detective Leavitt's promise to help him.

¶ 21 Lawrence Williams, who had convictions for possession of a controlled substance, retail theft, and theft, testified that he was in the park on the morning of August 26, 2016. He saw a dark-colored BMW in an alley behind a church. Shortly thereafter, he heard gunshots. Williams observed a "black guy" between 18 and 25 years old, with dreads and his face covered. The shooter entered the driver's side of the BMW, but Williams could not determine which door. He later viewed a photographic array, but did not identify anyone.

¶ 22 During cross-examination, Williams did not recall whether he initially stated that the shooter had dreads. He acknowledged that when he testified before the grand jury in January 2016, he described the shooter as having dreads and a visible tattoo for the first time.

¶ 23 During redirect, Williams explained that in October 2015, he was near Lexington and Sacramento when he saw Robinson. This was the first time Williams saw Robinson's face, and he noticed Robinson's facial tattoo and dreadlocks. At trial, Williams identified Robinson as the

person he saw that day. During recross, Williams acknowledged that on the day of the shooting, he did not tell the police that the shooter had dreadlocks and he did not observe facial tattoos.

¶ 24    Detective Leavitt testified that he spoke with Williams at the scene. Later that day, based upon information obtained by another detective, Detective Leavitt created a photographic array which included Robinson's picture and Ross identified Robinson as the shooter. In late September 2015, Detective Leavitt met with Boyd. He denied telling Boyd what to say. Boyd gave a videotaped statement during which he identified a photograph of Robinson and identified the driver as defendant. In June 2016, Detective Leavitt found out Hampton's identification. He spoke with Hampton on July 1, 2016, at a police station. Hampton agreed to give a videotaped statement and testified before the grand jury. On June 30, 2016, Detective Leavitt learned that defendant had been arrested. During cross-examination, Detective Leavitt testified that on the day of the shooting, Williams did not state that the shooter had a dreadlock hairstyle.

¶ 25    The State entered stipulations that on August 26, 2015, Washington suffered a gunshot wound to the right calf and Rogers had a "graze wound" to the left shoulder. Autopsies revealed that Lovette suffered a gunshot wound to the chest and Blakes suffered a gunshot wound to the head, and that their deaths were homicides.

¶ 26    Sue Mueller, a retired assistant district attorney for Sauk County, Wisconsin, testified that on August 26, 2015, defendant had a court date at 3:30 p.m. and her contemporaneous notes were timestamped 3:46 p.m. The Sauk County courthouse is about 170 miles from Chicago, an approximately 3½ hour drive. During cross-examination, Mueller acknowledged initially incorrectly telling Detective Leavitt in an email that defendant's appearance was at 1 p.m., and that he called to say he would be late.

¶ 27    Defendant presented the testimony of Erin Hanson, supervisor of investigations for the Office of Emergency Management and Communications.[3] Hanson investigated the "event queries" relating to the August 26, 2015 shooting and read them into the record. The information sent to dispatch indicated that a man had been shot near a gas station and another was shot in a park, and that the shooter was a male black with dreads, dressed in a black hoody and jeans, and riding a blue or silver bike.

¶ 28    During cross-examination, Hanson acknowledged that the records were the "calls as interpreted by a dispatcher," and she did not know what a caller actually observed. Additional calls stated that a man was shot, seven to eight gunshots were heard, and a group of "youths," including one on a bicycle, were observed running eastbound near a gas station.

¶ 29    In closing argument, defense counsel posited that the court could not rely on the "types of individuals" called by the State to find defendant guilty. Counsel further argued that only Boyd, who recanted at trial, was credible and that "nobody" identified defendant as "having anything to do with this case." During the State's rebuttal argument, the trial court noted that "pretty much the only way the Court's going to believe anything Ms. Hampton says is if there is other independent corroboration." The State agreed, but argued that Hampton's testimony about events inside the vehicle was corroborated and the only uncorroborated portion of her account was defendant's statement, " 'There they go.' "

¶ 30    In finding defendant guilty of first degree murder and aggravated battery with a firearm, the court noted that Hampton had "serious credibility issues," and that nothing she said would have

---

[3] Robinson called Erin Hanson, and defendant adopted her testimony.

"any credibility" were it not corroborated. The court concluded that defendant directed Robinson to retrieve a firearm, drove him to the park, waited, and then acted as a "get-away" driver.

¶ 31    Defendant filed a motion for a new trial and a motion to reconsider alleging in relevant part that Hampton's and Boyd's testimony was incredible. In denying the motions, the court noted that Hampton's testimony alone was insufficient, but that much of her testimony was corroborated, and that as trier of fact, the court was tasked with making credibility determinations.

¶ 32    The presentence investigation report stated that defendant was a member of the Traveling Vice Lords gang, and his prior convictions included, *inter alia*, aggravated unlawful use of a weapon, possession of a controlled substance, manufacture or delivery of cocaine, soliciting unlawful business, domestic battery, violation of an order of protection, and failure to return from furlough. After a hearing, defendant received two consecutive natural life sentences for first degree murder, to be served consecutively to two concurrent 18-year prison terms for aggravated battery with a firearm.

¶ 33                                    II. ANALYSIS

¶ 34                                    A. Jury Waiver

¶ 35    On appeal, defendant first contends that he did not knowingly and voluntarily waive his right to a jury because the trial court gave inadequate admonishments. Defendant acknowledges that he has failed preserve this claim for review because he did not raise it in the trial court. See, *e.g.*, *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). He asks this court to review his claim for plain error.

¶ 36    Pursuant to the plain error doctrine, this court may review unpreserved errors when there is an error and either (1) the evidence is closely balanced, or (2) the error is of such a serious

magnitude that it affected the integrity of the judicial process and deprived the defendant of a fair trial. *People v. Belknap*, 2014 IL 117094, ¶ 48. An error that deprives the defendant of his right to a jury trial is reviewable under the plain error doctrine because of the fundamental nature of the right. *People v. Bracey*, 213 Ill. 2d 265, 270 (2004); see also *People v. Gatlin*, 2017 IL App (1st) 143644, ¶ 32 ("when a defendant's right to a jury trial has been violated, such an error may be deemed" second prong plain error). The first step of plain error review is to determine whether error actually occurred because without error, there can be no plain error. *People v. Hood*, 2016 IL 118581, ¶ 18.

¶ 37    The fundamental right to a jury trial includes the defendant's right to waive a jury trial. *People v. Bannister*, 232 Ill. 2d 52, 65 (2008). To be valid, a jury waiver must be knowingly and understandingly made. *Bracey*, 213 Ill. 2d at 269. Although a court must ensure that a defendant's jury waiver is knowingly and understandingly made, it is not required to impart a specific set of admonishments or advise the defendant of the consequences of his waiver. *Bannister*, 232 Ill. 2d at 66. Whether a jury waiver is valid depends on the facts and circumstances of each case and does not rest on any "precise formula." *People v. Clay*, 363 Ill. App. 3d 780, 791 (2006). The key concept that a defendant must understand is that the judge, not a jury, will decide his case. *Bannister*, 232 Ill. 2d at 69.

¶ 38    "Although a signed jury waiver alone does not prove a defendant's understanding, it is evidence that a waiver was knowingly made." *People v. Reed*, 2016 IL App (1st) 140498, ¶ 7. Generally, a defendant's waiver is valid if it is pronounced in open court by defense counsel without the defendant's objection. *Bracey*, 213 Ill. 2d at 270. A defendant challenging the validity of his jury waiver has the burden to establish that it was invalid. *Reed*, 2016 IL App (1st) 140498,

¶ 7. Where the facts relating to the jury waiver are undisputed, we review *de novo* whether a defendant knowingly and understandingly waived his right to a jury trial. *Bracey*, 213 Ill. 2d at 270.

¶ 39 Here, during pretrial proceedings, trial counsel repeatedly stated in defendant's presence that defendant wanted to be tried by the court, and defendant made no objection. Additionally, in accepting defendant's jury waiver, the trial court inquired whether he understood what a jury trial was and that he was entitled to one. Defendant answered both questions affirmatively. The court next asked whether the jury waiver form, which defendant signed, was explained to him prior to signing, and defendant answered yes. The trial court then verified that defendant understood that by signing the jury waiver he was waiving the right to a trial by jury and that the matter would be tried by the court, and defendant again answered yes. See *Bannister*, 232 Ill. 2d at 69 (a defendant must understand is that the judge, not a jury, that will decide his case). Upon further questioning, defendant stated that no one threatened or promised him anything to him in exchange for signing the jury wavier, and that he freely chose to waive a jury trial. The court accepted defendant's jury waiver as knowingly and voluntarily given, and the record contains defendant's signed jury waiver. It states that defendant "waive[s] jury trial and submit[s] the *** cause to the Court for hearing."

¶ 40 Accordingly, the record reveals that the trial court ensured that defendant knowingly and understandingly waived his right to trial by jury. Moreover, when defendant waived his right to a jury trial, he had an adult history of criminal activity which included convictions for aggravated unlawful use of a weapon, possession of a controlled substance, and manufacture or delivery of cocaine, and had received multiple prison terms, "which suggests a familiarity with the criminal justice system and the right to a jury trial and belies any notion that he did not understand the

ramifications of his waiver" in this case. See *Gatlin*, 2017 IL App (1st) 143644, ¶ 15. Under these circumstances, defendant's jury waiver is valid. As defendant has not met his burden to show that his jury waiver was invalid, he cannot show error and his procedural default must be honored. *Reed*, 2016 IL App (1st) 140498, ¶ 7; *Hood*, 2016 IL 118581, ¶ 18.

¶ 41                                  B. Sufficiency of the Evidence

¶ 42    Defendant next contends that he was not proven guilty beyond a reasonable doubt when the identifications of him as the driver of the vehicle involved in the shooting were unreliable and unsupported by physical evidence.

¶ 43    When reviewing a challenge to the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts presented at trial. *Id.* "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *Id.* We do not reverse a defendant's conviction "simply because the evidence is contradictory or because the defendant claims that a witness was not credible." *People v. Gray*, 2017 IL 120958, ¶ 36. Rather, reversal is warranted only where the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of a defendant's guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 44    Here, defendant was found guilty of first degree murder and aggravated battery with a firearm under a theory of accountability. A person commits first degree murder if, in performing

the acts that cause a death, he intends to kill or do great bodily harm to the victim, or knows that such acts will cause the victim's death (720 ILCS 5/9-1(a)(1) (West 2014)), and aggravated battery with a firearm when he knowingly discharges a firearm and causes injury to another (720 ILCS 5/12-3.05(e)(1) (West 2014)).

¶ 45 A person is legally accountable for the conduct of another when he, before or during the commission of an offense and with the intent to promote or facilitate that commission, solicits, aids, abets, agrees, or attempts to aid the other person in planning or committing the offense. 720 ILCS 5/5-2(c) (West 2016). To prove that a defendant intended to promote or facilitate a crime, the State may present evidence that either (1) he shared the principal's criminal intent, or (2) there was a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 13. Under the common design rule, all parties to a common criminal design or agreement are responsible for the consequences of any act committed in furtherance of the design or agreement. *Id.* In other words, "where one aids another in the planning or commission of an offense, that person is legally accountable for the conduct of the person he aids," including "any criminal act done in furtherance of the planned and intended act." *Id.* ¶ 18.

¶ 46 Here, considering the evidence in its entirety and in the light most favorable to the State, we cannot say that no reasonable trier of fact could have found defendant guilty beyond a reasonable doubt when he was identified as the driver of the dark-colored vehicle which brought Robinson to and from the scene of the shooting. The evidence established, through Boyd's statement to the police and grand jury testimony, and Hampton's testimony at trial and before the grand jury, that after an incident between rival gangs, defendant instructed Robinson to retrieve a firearm, drove him to the park, waited, and then drove him away following the shooting.

Additionally, multiple witnesses identified Robinson by his facial tattoo and hairstyle as the shooter and stated that he arrived and left the scene in a dark-colored foreign-made vehicle.

¶ 47    Defendant nonetheless contends that Hampton, a convicted felon, lacked reliability when she did not come forward on her own, did not disclose this offense to federal authorities, and was motivated to lie to deflect attention from herself as a passenger in the vehicle from which the shooter emerged. We reiterate that in a bench trial, it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh the evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228-29 (2009). Moreover, as the trial court noted, the majority of Hampton's testimony was corroborated by other witnesses. Specifically, Hampton's testimony that defendant drove her and Robinson from Lexington and Sacramento to the park and back in his dark-colored sedan was corroborated by Ross and Williams, who also placed a dark-colored BMW at the scene of the shooting and identified Robinson as the shooter. Hampton's testimony that Robinson exited the vehicle with his face covered by a t-shirt while holding a firearm was also consistent with the testimony of Ross and Williams. The description of the firearm as having an extended clip comports with the description Boyd gave in his videotaped statement and before the grand jury.

¶ 48    Defendant further argues that Boyd's testimony at trial supports his innocence. At trial, Boyd denied being present at Lexington and Sacramento the morning of the shooting and testified that he only said he was there because Detective Leavitt promised to help him with a pending case, an assertion that Detective Leavitt denied. In his previous statements, Boyd related that following an incident between the GD and Traveling Vice Lords gangs, defendant arrived in a dark foreign-made vehicle, possibly a BMW, accompanied by his girlfriend, and told Robinson to "grab that."

Boyd then saw Robinson retrieve a firearm with an extended clip from a trap house, and leave in defendant's vehicle. When the vehicle returned 20 minutes later, Robinson said he "got two of 'em" and returned the firearm to the trap house. Boyd also expressed that he came forward because he knew one of the victims and thought what happened was wrong. Additionally, Boyd acknowledged at trial that he identified defendant in a photographic array.

¶ 49    Initially, we note that the complained-of evidence, Boyd's prior inconsistent statements, were admitted as substantive evidence pursuant to section 115-10.1 of the Illinois Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2014)), which permits the use a witness's prior inconsistent statement as substantive evidence when he is subject to cross-examination regarding the statement and it:

> "was made under oath at a trial, hearing, or other proceeding, or narrates, describes, or explains an event or condition of which the witness had personal knowledge, and *** the witness acknowledged under oath the making of the statement *** or the statement is proved to have been accurately recorded by *** videotape recording." *Id*.

¶ 50    Here, defendant did not object at trial to the admission of this evidence and does not challenge its admission on appeal; rather, he argues that these prior inconsistent statements lacked reliability because Boyd disavowed his videotaped statement and grand jury testimony at trial and no other reliable evidence connected defendant to the shooting.

¶ 51    We find *People v. Morrow*, 303 Ill. App. 3d 671 (1999), instructive. In that case, the defendant was indicted for murder and armed robbery, and a witness implicated him in a pretrial statement to detectives and an ASA, and in her testimony before the grand jury. *Id*. at 673-74. At trial, the witness denied knowing the victim and being present at the murder, but did not deny that

she gave the pretrial statement and grand jury testimony. *Id*. at 674-75. The defendant was convicted, and argued on appeal that his convictions were solely based upon the witness's "inherently untrustworthy" testimony. *Id.* at 673, 675.

¶ 52    On appeal, we explained that even in cases with "no corroborative evidence, it does not necessarily portend that, as a matter of law, a recanted prior inconsistent statement admitted under section 115-10.1 cannot support a conviction." *Id.* at 677. We explained that if a prior statement meets the requirements of section 115-10.1, a finding of reliability and voluntariness is automatically made and it is for the jury, after hearing the declarant's inconsistent testimony, to weigh the statement and decide whether it was voluntary. *Id.* In other words, the previous inconsistent statements alone were sufficient to prove the defendant's guilt beyond a reasonable doubt. *Id.*; see also *People v. Zizzo*, 301 Ill. App. 3d 481, 489 (1998) (when a defendant is convicted on the basis of a recanted prior inconsistent statement, "the only inquiry" is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found defendant guilty beyond a reasonable doubt).

¶ 53    Here, the trial court found Boyd's videotaped statement and grand jury testimony implicating defendant more credible than his trial testimony denying that he witnessed the events and asserting that his prior statements were the creation of a detective. Here, the trial court found Boyd's prior statements to be credible and his trial testimony rejecting those statements incredible, as evidenced by its verdict. That determination was within the court's discretion, and we will not substitute our judgment therefor. See *Siguenza-Brito*, 235 Ill. 2d at 228 ("in a bench trial, it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence").

¶ 54    We further note that the details that Boyd provided were corroborated by other witnesses, namely, that Hampton was also in the vehicle and that Robinson had a firearm with an extended clip. Moreover, Boyd's trial testimony disavowing his prior statements and explanation for the statements was subject to examination by the State and defense. Given its verdict, the trial court resolved the inconsistencies in favor of the State and determined that Boyd told the truth when he made the prior videotaped statement and testified before the grand jury. See *Morrow*, 303 Ill. App. 3d at 676-77; *Zizzo*, 301 Ill. App. 3d at 489-90 (a reviewing court may presume the jury's verdict reflects that it found a witness's prior inconsistent statement more trustworthy than his trial testimony). We have no basis to disturb this conclusion.

¶ 55    Notwithstanding, defendant relies on *People v. Reyes*, 265 Ill. App. 3d 985 (1993), to support his argument that his convictions cannot be sustained by a disavowed witness statement given the lack of corroborative evidence. In *Reyes*, we determined that the State had not proven the defendant guilty beyond a reasonable doubt of attempt murder and aggravated battery where the only evidence to contradict the defendant's testimony that he had not participated in the group beating was two witnesses' grand jury testimony. *Reyes*, 265 Ill. App. 3d at 988-89. We found the credibility of this grand jury testimony "greatly reduced" because (1) both witnesses recanted during the defendant's trial; (2) both statements consisted merely of "yes" and "no" answers to leading questions from the State; and (3) one of the witnesses testified, without contradiction, that the police had coerced her into identifying the defendant. *Id.* at 989. Because the disavowed grand jury testimony was the sole evidence of the defendant's guilt, we determined that the State failed to prove him guilty beyond a reasonable doubt. *Id.* at 990-91.

¶ 56 Here, Boyd indicated in his prior statements that he came forward because he knew one victim and thought what happened was wrong. Although he testified at trial that the prior inconsistent statements were made at Detective Leavitt's instruction in order to obtain "help" in another case, Detective Leavitt testified that he did not give Boyd information to create a statement. Thus, *Reyes* is distinguishable from this case. We also note that *Reyes* was decided under its particular facts and does not establish, as a matter of law, that a recanted prior inconsistent statement cannot support a conviction. See *Zizzo*, 301 Ill. App. 3d at 489 (rejecting the defendant's argument that *Reyes* and cases with similar holdings "establish, as a matter of law, that a recanted prior inconsistent statement cannot support a conviction").

¶ 57 Here, although no physical evidence linked defendant to the shooting, Hampton and Boyd testified that defendant drove Robinson to and from the shooting, and that Robinson possessed a firearm with an extended clip. Additionally, Hampton, Ross, and Williams identified Robinson as the shooter. While defendant is correct that Hampton and Boyd are convicted felons, their credibility was ultimately a matter for the trier of fact. See *People v. Howard*, 376 Ill. App. 3d 322, 329 (2007) ("A convicted felon is not automatically precluded from providing credible testimony."); see also *People v. Phillips*, 127 Ill. 2d 499, 510 (1989) (trier of fact is responsible for weighing the credibility of witnesses, including felons). Moreover, when weighing evidence, the trier of fact is not required to disregard inferences flowing naturally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to the level of reasonable doubt. *In re Jonathon C.B.,* 2011 IL 107750, ¶ 60.

¶ 58 Accordingly, we find that after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of first degree murder

and aggravated battery, under an accountability theory, beyond a reasonable doubt. See *McLaurin*, 2020 IL 124563, ¶ 22. We therefore affirm defendant's convictions for first degree murder and aggravated battery with a firearm.

¶ 59                                III. CONCLUSION

¶ 60    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 61    Affirmed.